UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
AQUA HARVESTERS, INC., BAY HEAD, INC.,
C. SEAMAN SEAFOOD, LTD, DOXSEE SEA CLAM
CO., EDGAR SEAFOOD PRODUCTS, INC.,
FERNANDEZ & FAMILY, INC., FREEPORT SEA
CLAM CO., INC., LADY KIM, INC., LYONS
FISHERIES, INC., OFF SHORE DIVING CORP.,
PEK CLAIM CO., INC., SMJ PRODUCTS CORP.,
ST. PETER DOCK, INC., VERBEKE, INC., WINTER
HARBOR BRANDS, INC., AMERICAN PRIDE
SEAFOOD, LLC, LET VESSELS, LLC,
TMT VESSELS (NY), LLC, ATLANTIC CAPES
FISHERIES, INC., GALILEAN SEAFOODS, LLC,
OCEANSIDE PACKERS, INC., and
SEAWATCH INTERNATIONAL, LTD,

       Plaintiffs,

   -against-

NEW YORK STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION and
BASIL SEGGOS, *in his capacity*
*as Commissioner of the New York State Department*
*of Environmental Conservation*,

       Defendants.
----------------------------------------------------------------X
APPEARANCES:

   Jeffrey Lee Snead
   J. Lee Snead, Esq.
   144 South Country Road
   P.O. Box 489
   Bellport, NY 11713
    *Attorney for Plaintiffs*

   Elizabeth Morgan
   New York State Office of the Attorney General
   120 Broadway, 24th Floor
   New York, NY 10271
    *Attorney for Defendants*

**FILED**
**CLERK**

7/11/2019 2:58 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM & ORDER**
17-CV-1198 (JMA) (AKT)

Vincent Lipari
United States Attorneys Office
Eastern District of New York
610 Federal Plaza, 5th Floor
Central Islip, NY 11722-4454

Brian Judge
Bronwyn Douglass
Office of the Judge Advocate
United States Coast Guard
2703 Martin Luther King Ave SW
610 Federal Plaza Washington, D.C., 20593
    *Attorneys for the United States Coast Guard*

**AZRACK, United States District Judge:**

New York State regulates the surfclam fishery in its waters through statute and through regulations promulgated by the New York State Department of Environmental Conservation ("DEC"). The Plaintiffs here are various surfclam harvesting companies that hold permits for this fishery along with other entities involved in the fishery, including vessel owners and processors. The defendants are DEC and Basil Seggos, the Commissioner of DEC, in his official capacity. (See ECF No. 17; December 15, 2017 Order.)

Plaintiffs brought this action to challenge three state laws: the Single Vessel Rule, the 70-Foot Rule, and the Residency Rule. Plaintiffs assert that these laws are preempted by federal fishery endorsements held by vessels owned by certain Plaintiffs. Plaintiffs also claim that these laws violate the Dormant Commerce Clause, the Privileges and Immunities Clause, and/or the Equal Protection Clause. Pending before the Court is Plaintiffs' motion for a preliminary injunction seeking to enjoin enforcement of the three challenged laws. For the reasons stated below, Plaintiffs' motion is denied.

# I. BACKGROUND

## A. Overview of the Surfclam Fishery

New York's Atlantic Ocean surfclam fishery (the "Surfclam Fishery") is located in waters that are all within three nautical miles of New York's coastline. (Decl. of Deborah Barnes ("Barnes Decl.") ¶ 2, ECF No. 10); 6 N.Y.C.C.R.R. §§ 43-1.1, 43-2.3. The Surfclam Fishery is regulated by DEC.

Besides New York's Surfclam Fishery, there are also surfclam fisheries in other states and in the federally regulated exclusive economic zone, the area between 3 miles and 200 miles from shore. (See Amendment 1 to the Fishery Management Plan ("FMP Amendment 1") at 1–2, Complaint Ex. C); see generally New York v. Atl. States Marine Fisheries Comm'n, 609 F.3d 524, 527, 532 (2d Cir. 2010). New York's Surfclam Fishery, however, is important to the entities that process surfclams for human consumption because "the inshore fishery off Long Island can be often pursued when the weather will impede the federal offshore vessels' efforts to fish for surf clams in offshore federal waters." (Aff. of Chris Shriver ("Shriver Aff.") ¶ 7, ECF No. 2.) Thus, although it appears that surfclams are generally fungible, the surfclams from the New York Surfclam Fishery apparently have a particular value to processors because a steady supply from this fishery allows processors to keep their plants operating during "weather impacted times, which keeps [their] employees working and [their] customers supplied." (Id.)

In addition to the market for surfclams that are sold for human consumption, the bait market also purchases surfclams. (Decl. of J. Lee Snead ("Snead Decl.") ¶¶ 67, 76. ECF No. 2.)

As explained further infra, DEC closed the Surfclam Fishery in 1993 and only allowed harvesting companies and vessels that were harvesting at that time to obtain the Surfclam Permits issued by DEC that are now necessary to harvest in the fishery. The Surfclam Fishery consists,

generally, of two types of harvesting companies that hold Surfclam Permits—harvesting companies which are controlled by entities that process clams for human consumption and "independent" companies. At present, all such surfclam processors are located outside of New York.

When the Surfclam Fishery was closed in 1993, the majority of the harvesting companies that obtained permits were independent owner-operators who relied on the Surfclam Fishery for their livelihood. (Barnes Decl. ¶ 12.) At that time, most of these independent companies appear to have owned a single vessel. Since 1993, many of these independent owner-operator harvesting companies have been acquired by out-of-state entities affiliated with the processors located outside of New York.

At present, there are 17 harvesting companies that hold Surfclam Permits. One processor, Seawatch International, Ltd. ("Seawatch") currently controls eleven harvesting companies. Another out-of-state processor controls two harvesting companies. There are only two independent owner-operators who still own surfclam vessels that they consistently operate in the Surfclam Fishery. There are two other remaining "independent" companies—however, they do not own their own usable vessels. At present, in total, 12 out of the 17 harvesting companies do not own their own usable vessels—8 of these 12 harvesting companies are controlled by Seawatch.

In addition to the harvesting companies that hold Surfclam Permits, there are also companies in the Surfclam Fishery which own clamming vessels that they lease to the harvesting companies that have Surfclam Permits, but no longer have their own usable clamming vessels. At present, there are three such companies operating in the Surfclam Fishery.

In 2009, DEC decided to change the regulatory regime governing the Surfclam Fishery by enacting an Individual Fishing Quota ("IFQ") system, which took effect in 2010. At present, the

17 harvesting companies each receive one IFQ, which allows each vessel to harvest 1/17[th] of the total annual harvest limit in a given year.[1]

In 2016, DEC adopted the Single Vessel Rule, a regulation that limits each vessel in the fishery to harvesting only one IFQ, which, according to DEC, was done to protect the independent owner-operators. The twelve harvesting companies that no longer own usable vessels maintain that the Single Vessel Rule, along with the Residency Rule and the 70-Foot Rule—two other laws that limit which vessels can be used in the Surfclam Fishery—will prevent most of them from harvesting IFQs. Fifteen of the harvesting companies, along with vessel-leasing companies and other related entities, filed the instant suit, which challenges: (1) the Single Vessel Rule; (2) the Residency Rule—a regulation adopted by DEC in 1993; and (3) the 70-Foot Rule—a New York statute enacted in 1997.

**B. History of DEC's Regulation of the Surfclam Fishery**

Prior to 1993, the Surfclam Fishery was largely unregulated and there were no restrictions on the number of participants, vessels, or the number of surfclams that could be taken. (Snead Decl. ¶ 29.) During the 1970s and 1980s, approximately five vessels regularly harvested clams in the Surfclam Fishery. (FMP Amendment 1 at 3.) Beginning in 1991, the number of fishermen in the Surfclam Fishery increased due to restrictions placed on the surfclam fishery in federally regulated waters. (Id. at 3.) In 1992, this resulted in a total harvest from the New York Surfclam Fishery of nearly 500,000 bushels, which was almost triple the prior 20-year average. (Id.)

In 1993, DEC adopted emergency regulations that: (1) closed the Surfclam Fishery, turning it into a "limited entry" fishery; and (2) also imposed other control measures. At the time, a majority of the harvesting companies were independent owner-operators. (Barnes Decl. ¶ 12.)

---

[1] As explained infra, the IFQ allocations are technically assigned to each harvesting company's "eligible" vessel. Not all the "eligible" vessels are actually able to harvest surfclams.

A year later, in 1994, the New York Legislature passed legislation that required DEC's regulations for the Surfclam Fishery to "take into consideration and attempt to maintain the economic viability of":

> those portions of the surf clam harvesting and processing industry that have a longstanding investment in the domestic surf clam industry; and . . . .

> the traditional established New York based commercial surf clam/ocean quahog harvesting industry, processors and packers that rely on this fishery.

N.Y. Envtl. Conserv. Law ("ECL") §§ 13-0309(12)(e)–(f).

DEC adopted its emergency regulations to "conserv[e] the surfclam resource and prevent[] an increase in fishing effort until such time as a comprehensive surfclam management plan was adopted pursuant to [NY ECL §] 13-0308." (FMP Amendment 1 at 3.)

In these regulations, DEC determined that only harvesting companies with vessels that had harvested surfclams in the Surfclam Fishery between January 1, 1993 and August 24, 1993 could obtain a permit for the Surfclam Fishery. 6 N.Y.C.C.R.R. § 43-3.4(a); (FMP Amendment 1 at 3; Barnes Decl. ¶ 7; Snead Decl. ¶ 13). At the time, 25 vessels met this criteria—each of these vessels qualified as "eligible" vessels under DEC's regulations and were permitted to continue to harvest in the Surfclam Fishery. 6 N.Y.C.C.R.R. § 43-3.4(a); (FMP Amendment 1 at 3). While most of the harvesting companies that obtained Surfclam Permits in 1993 appear to have owned only a single eligible vessel, it appears that at least four of the harvesting companies owned multiple eligible vessels. (See Snead Decl. ¶¶ 32, 38, 43 n.8, 49.)

All of the harvesting companies that obtained Surfclam Permits in 1993 are New York corporations. (Snead Decl. ¶ 10.) DEC's regulations do not allow a harvesting company to transfer its Surfclam Permit to another entity. (See Barnes Decl. ¶ 7.)

DEC's regulations for the Surfclam Fishery also initially included: (1) gear restrictions; (2) daily and weekly catch limits for each vessel; and (3) a total annual harvest limit for the entire Surfclam Fishery. (Snead Decl. ¶ 33 (citing N.Y.C.C.R.R. §§ 43-2.1 & 43-2.2); see also N.Y.C.C.R.R. § 43-2.5; Fishery Management Plan ("FMP") at 3, Compl. Ex. B.)

In order to hold a Surfclam Permit, a harvesting company must own or lease a vessel eligible to participate in the Surfclam Fishery and identify that vessel on its Surfclam Permit. 6 N.Y.C.C.R.R. §§ 43-2.4, 43-3.5; (Notice of Adoption, NYS Register/July 27, 2016 at 13, Compl. Ex. A; FMP Amendment 1 at 3; Barnes Decl. ¶ 8). DEC regulations limit the vessels that can be used in the Surfclam Fishery, providing that:

> Only those vessels which . . . harvest[ed] surf clams by mechanical means from [the Surfclam Fishery] between January 1, 1993 and August 25, 1993 . . . and those vessels which have replaced such vessels pursuant to the [Replacement Rule] shall be eligible to be used to harvest surf clams.

6 N.Y.C.C.R.R. § 43-3.4. Another regulation, 6 N.Y.C.C.R.R. § 43-3.5 (the "Replacement Rule"), allows a permit holder to replace its vessel under certain conditions.[2] The Replacement Rule has been in place since the closure of the Surfclam Fishery in 1993. (Snead Decl. ¶ 11.)

Two other provisions of New York law—the Residency Rule and the 70-Foot Rule—impose further restrictions on which vessels the harvesting companies may use under the Replacement Rule.

---

[2] Specifically, the Replacement Rule states:

> (a) The owner or lessee of an eligible vessel may replace such vessel with another vessel at any time for any reason, provided that the vessel being replaced becomes ineligible for use in the fishery, unless such replaced vessel is used to replace another eligible vessel.

> (b) Unless used in place of another eligible vessel, an eligible vessel shall become ineligible for use in the fishery upon sale or transfer by the owner or lessee of the eligible vessel. . . .

6 N.Y.C.C.R.R. § 43-3.5.

DEC's regulations distinguish between resident and non-resident permits for the Surfclam Fishery—these distinctions have been in place since 1993. 6 N.Y.C.C.R.R. § 43-2.4(a)–(f); (Barnes Decl. ¶ 9.) One regulation—6 N.Y.C.C.R.R. § 43-2.4(d) (the "Residency Rule")—bars any non-resident vessels from being used in the Surfclam Fishery by a harvesting company that holds a New York "resident" Surfclam Permit. (See also Barnes Decl. ¶¶ 9–10.) All the harvesting companies that hold Surfclam Permits are New York corporations with New York "resident" permits.[3] A non-resident vessel can only be used on a non-resident Surfclam Permit.[4]

In addition to DEC's Residency Rule regulation, one New York statute further limits the vessels that can be used in the Surfclam Fishery. When DEC closed the Surfclam Fishery in 1993, DEC's regulations did not include any specific limitations on vessel size. However, in 1997, the New York State Legislature enacted N.Y. ECL § 13-0349 (the "70-Foot Rule"). See Environmental Conservation—Marine Resources—Permits, Licenses, Fees, 1997 Sess. Law News of N.Y. Ch. 263 (S. 5410–D) (McKinney's). The 70-Foot Rule generally precludes all vessels over 70 feet long from fishing in New York waters. (Id.) There is, however, an exception for any vessels over 70 feet long that were fishing in New York waters as of July 1, 1997—those vessels

---

[3] The record indicates that in 1995, one harvesting company, Verbeke, Inc., was able to lease a vessel owned by a Massachusetts company. (Snead Reply Decl. ¶ 24; Verbeke Aff. ¶ 3.) DEC apparently permitted this arrangement despite the Residency Rule—the record does not explain why that occurred.

[4] Although, theoretically, non-resident permits exist, no out-of-state resident has ever actually been eligible to obtain such a permit because only New York State corporations were clamming in the Surfclam Fishery in 1993 when it was closed. (Barnes Decl. ¶ 11.) In addition, DEC's regulations only allow out-of-state residents and corporations to obtain a non-resident permit if their home state offers reciprocal clamming privileges to New York residents. See 6 N.Y.C.C.R.R. § 43-2.4(b). It appears that no other states offer such reciprocal clamming privileges to New York residents. (Snead Decl. ¶ 18; Declaratory Ruling, DEC No. 11-09 at 6, Dermont Aff. Ex 2.)

DEC's regulations governing the Surfclam Fishery are not the only New York fishery laws that distinguish between resident and non-resident permits. According to DEC, "New York also distinguishes between resident and nonresident commercial fishing licenses and permits for, e.g., food fish, lobster, crab, whelk and shellfish digger, some of which also require reciprocity for issuance of non-resident permits." (Barnes Decl. ¶ 9.) DEC maintains that "New York's requirements are in keeping with many other states which also distinguish between resident and non-resident permits in the commercial fishing context." (Id.)

are grandfathered in and can continue to fish in New York waters.  (Id.)  The 70-Foot Rule applies

to all fisheries in New York waters, including the Surfclam Fishery.  The background and

legislative history of the 70-Foot Rule are discussed in further detail infra.[5]

## C.  State of the Surfclam Fishery Prior to the IFQ Regime

After the enactment of the 70-Foot Rule in 1997, DEC issued a Fishery Management Plan

("FMP") for the Surfclam Fishery in 2003 after years of debate within the industry.  (FMP at 3.)

When the FMP was adopted in 2003, there was increased market demand for surfclams.  (FMP

Amendment 1 at 4.)

In the FMP, DEC eliminated the daily catch limit for each vessel, which, at the time, was

set at only 14 cages per day.  (FMP at 8; FMP Amendment 1 at 17, 26.)  The FMP, however,

retained a weekly catch limit for each vessel, which could not exceed 28 cages per week and which

was sometimes set below that number.  (See FMP at 8; FMP Amendment 1 at 17, 26 (indicating

that, in 2009, there was a 14 cage weekly catch limit).)  The FMP also divided the total allowable

catch into four quarterly quotas.  (FMP at 7–8.)

The regulatory regime outlined above remained in place with certain modifications until

2010, when the current IFQ system took effect.

When the Surfclam Fishery was closed in 1993, 25 vessels qualified as "eligible" vessels

that could continue to be used by the harvesting companies in the Surfclam Fishery.  (Snead Decl.

¶ 32.)  However, Plaintiffs maintain that, due to the costs of maintaining old vessels, many

harvesting companies have found it uneconomical or financially impossible to refurbish or

---

[5]  In 2010, the 70-Foot Rule was amended to allow all registered vessels that are 63 feet or longer to be replaced one time by a new vessel that is ten-percent longer.  N.Y. ECL § 13-0349.

maintain their vessels for use.[6] (Id. ¶ 12; Dermont Aff. ¶ 13.)  As such, although each harvesting company must identify an eligible vessel on its Surfclam Permit to retain the permit, that vessel may not be "usable" as the company may not actually be able to harvest from that vessel.  (Id. ¶ 12.)  This has resulted in harvesting companies "administratively 'park[ing]' their permits on vessels that were not usable (either due to condition or size) for harvesting in order to keep the permit alive."  (Dermont Aff. at 9 n.3.)  Since 1999, a harvesting company can retain its Surfclam Permit even if it does not harvest any surfclams in a given year.  (FMP Amendment 1 at 19.)

By 2009, three eligible vessels had been removed from the Surfclam Fishery, leaving 22 eligible vessels.[7]  (Notice of Adoption, at 13; FMP Amendment 1 at 3.)

Although all eligible vessels did not harvest every year, substantial percentages of eligible vessels continued to harvest between 2005 and 2009.  (Notice of Adoption at 13.)  In 2005, 22 vessels harvested.  (Id.)  In 2007, 19 vessels harvested and, in 2009, 17 vessels harvested.  (Id.)

As noted earlier, prior to the adoption of the IFQ system in 2010, there was a weekly catch limit for each vessel, which could not exceed 28 cages per week and was sometimes set below that number.  (See FMP Amendment 1 at 17; FMP at 8.)  It appears that harvesting companies that wished to harvest needed separate usable vessels during this period to ensure that they could harvest the weekly allowance for their eligible vessel or vessels.  The regulations in force prior to

_____

[6] Unlike other types of fishing vessels, which can harvest a variety of fin-fish or shellfish, surfclam vessels are only used in the harvesting of surfclams or ocean quahogs.  (Dermont Aff. ¶ 15.)  Surfclams are harvested using dredges and hydraulic pumps, which, along with other equipment, such as cranes and winches, must be fastened to the deck of the vessel.  (Dermont Aff. ¶ 15; FMP Amendment 1 at 18.)  As such, surfclam vessels are not capable of being easily re-configured for use in other fisheries and, once a vessel is configured as a surfclam vessel, its use in that capacity is near permanent.  (Snead Decl. ¶ 10; Dermont Aff. ¶ 15.)  Plaintiffs maintain that outfitting a surf-clamming vessel can cost hundreds of thousands of dollars.  (Dermont Aff. ¶ 16.)

[7] Two of these vessels were removed from the Surfclam Fishery because they failed to meet annual minimum-catch requirements.  (FMP Amendment 1 at 3; Snead Decl. ¶ 37 at n.6.); see also Shellfish, Inc. v. New York State Dep't of Envtl. Conservation, 76 A.D.3d 975, 908 N.Y.S.2d 53 (2d Dep't 2010) (upholding the revocation, for a different reason, of one of Shellfish, Inc.'s two harvesting permits).  These minimum-catch requirements were subsequently repealed in April 1999 because market conditions made it difficult for all of the vessels in the Surfclam Fishery to meet those requirements.

2010 required a harvesting company to either harvest an eligible vessel's weekly allowance or lose the right to catch that eligible vessel's weekly allowance, with no subsequent make-up trips allowed.  (See FMP Amendment 1 at 17.)

The record does not indicate when, exactly, Seawatch acquired control of its eleven harvesting companies.  However, it appears that by 2009, Seawatch controlled nine or ten harvesting companies.  (Reply Decl. J. Lee Snead ("Snead Reply Decl.") Decl. ¶ 10 & n.1 (stating that "with three exceptions" all of the harvesting companies have been under their present ownership since 2009), ECF No. 14.)

In 2009, DEC observed that:

> The fishery is strongly influenced by market conditions and limited availability of buyers and processors.  As a result, some vessels cannot sell their clams and are closed out of the fishery.  In New York, approximately 30% of the fishery does not have a market for their clams and therefore, are unable to fish for most of the year.

(FMP Amendment 1 at 13.)

## D.  The IFQ System

In October 2009, DEC issued Amendment 1 to the FMP, which adopted, for the first time, an IFQ system to manage the Surfclam Fishery.[8]  (Snead Decl. ¶¶ 44–47; FMP Amendment 1.)  In

---

[8]  When DEC amended N.Y. ECL § 13-0309(12) in 1994 concerning the Surfclam Fishery, it also revised § 13-0308, a provision that was subsequently repealed in 2012.  See 1994 N.Y. Sess. Laws, ch. 512 (S. 6851-A, A. 9725-A) (McKinney's) (repealed by L.2012, c. 60, pt. D, § 68, eff. Mar. 30, 2012).  Among other things, the 1994 revision to § 13-0308: (i) permitted DEC to enact emergency regulations, until an FMP was issued, that maintained "the economic viability of the traditional established New York based commercial surf clam/ocean quahog harvesting industry participants"; and (ii) defined "traditional" to mean "prior to [1989]".

 As part of the FMP issued in 2003, DEC adopted a definition of "traditional."  DEC did so because § 13-0309(12) requires DEC to "take into consideration and attempt to maintain the economic viability of . . . the traditional established New York based commercial surf clam/ocean quahog harvesting industry."  (Emphasis added).  In the 2003 FMP, DEC considered multiple alternative definitions of "traditional," but ultimately concluded that, in order to be considered a "traditional" participant, the participant had to, inter alia, have been licensed to harvest or process fish, clams, or lobsters in New York in 1989 and had to demonstrate a catch or processing history in the surfclam/ocean quahog fishery since 1993.  (FMP at 12.)  All 17 of the current harvesting companies meet the definition of "traditional" under the 2003 FMP.  (Snead Decl. ¶ 40.)  According to Plaintiffs, "[i]n addition to including those companies and owners who had lawfully entered the Fishery prior to 1989, the FMP expanded the definition of 'traditional' participants to include those who could establish a certain level of participation and harvesting activity

December 2009, DEC enacted regulations establishing the IFQ system, which took effect for the 2010 clamming season.  (6 N.Y.C.C.R.R. § 43-2.6; Barnes Decl. ¶ 17; FMP Amendment 1 at 16–17.)

Under the IFQ system, each year DEC determines a total annual harvest limit.  (FMP Amendment 1 at 16.)  DEC sets this annual harvest limit at a level that is "protective of the surf clam resource and intended to promote long-term sustainability" of the Surfclam Fishery.[9]  (Id.)

Once DEC sets the annual harvest limit, it then determines the amount of each IFQ by dividing the annual harvest limit by the number of eligible vessels in the Surfclam Fishery to determine the amount of each IFQ.  (Barnes Decl. ¶ 17.)  Each eligible vessel is then assigned an IFQ.[10]  (6 N.Y.C.C.R.R. § 43-2.6(b); Notice of Adoption at 11–12.)

As part of the IFQ system, DEC also regulates the Surfclam Fishery in various other respects, including through, inter alia:

(1) the same gear restrictions that have been in place since 1993, 6 N.Y.C.C.R.R. § 53-2.5; (FMP Amendment 1 at 30);

---

subsequent to 1993."  (Snead Decl. ¶ 39).  As noted earlier, when the FMP was adopted in 2003, there was increased market demand for surfclams.  (FMP Amendment 1 at 4.)

In Amendment 1 to the FMP, which DEC adopted in 2009, at a time of less favorable market conditions, DEC changed the definition of traditional, which now means "established commercial surfclam/ocean quahog harvesting industry participants . . . who were in the fishery, made and investment in the domestic surfclam industry and relied on the fishery for their economic viability prior to 1989."  (FMP Amendment 1 at iv, 37.)  Amendment 1 to the FMP acknowledges that "only a small fraction of the current eligible surfclam fishery participants" meet this definition of "'traditional.'"  (FMP Amendment 1 at 37.)

[9] Since the IFQ system's adoption and implementation in 2009 and 2010, the total annual harvest limit has decreased.  Although in 2008, the total annual harvest limit was set at 400,000 bushels, by 2017, DEC had lowered it to 184,558 bushels.  (FMP Amendment 1 at 4, Snead Decl. ¶¶ 44, 53, 2017 Harvest and Management Provisions, Snead Decl. Ex. 5.)

[10] DEC's regulations state that the IFQs are assigned to each eligible vessel in the Surfclam Fishery.  (6 N.Y.C.C.R.R. § 43-2.6(b); see also FMP Amendment 1 at 16, 25.)  As explained earlier, each harvesting company that holds a Surfclam Permit must identify an eligible vessel on its Surfclam Permit.  Thus, through this process, each harvesting company effectively receives one IFQ, although that IFQ is actually assigned to the company's eligible vessel.

(2) a daily catch limit per vessel of 28 standard cages, which is the maximum carry capacity of most vessels traditionally used in the Surfclam Fishery, 6 N.Y.C.C.R.R. § 43-2.6(c); (FMP Amendment 1 at 29–30);

(3) an electronic vessel monitoring system that allows DEC to track the location of vessels used in the Surfclam Fishery, 6 N.Y.C.C.R.R. § 43-2.9 (FMP Amendment 1 at 36); and

(4) a system of cage tags for each cage used in the fishery, 6 N.Y.C.C.R.R. § 43-2.6; (FMP Amendment 1 at 40).

The latter two enforcement mechanisms were imposed, for the first time, as part of the IFQ system. (FMP Amendment 1 at 17, 29–31, 36, 40; see also id. at 19 ¶ 2.2.10.) In adopting the IFQ system, DEC eliminated weekly and quarterly catch limits. (Id.) Other relevant regulations and laws, including the Replacement Rule, the Residency Rule, and the 70-Foot Rule remained in effect.

The IFQ system allows harvesting companies greater flexibility to decide when they want to fish, and it abandoned the earlier regime, which required each vessel to either fish every week regardless of weather conditions or miss a valuable fishing opportunity. (FMP Amendment 1 at 17.) The IFQ system, thus, promotes, inter alia, vessel safety and increased economic efficiency by allowing fishermen "to fish during peak market demands" and to "schedule fishing trips in response to processing capacity." (Id.) In Amendment 1 to the FMP, DEC considered, but ultimately rejected, options that would have allowed IFQs to be "consolidated or transferred" and instead concluded that "each vessel can only be used to catch one quota allocation." (Id. at 25.)

A clamming vessel can harvest one IFQ allocation in as few as two to three weeks.[11] (Snead Decl. ¶ 53; see also FMP Amendment 1 at 4, 25 (discussing how many trips it would take

---

[11]  Allowing a single vessel to harvest multiple IFQs would have, inter alia, also increased economic efficiency in another respect because it would have encouraged a reduction in the over-capitalized harvesting fleet. DEC, however, rejected such an approach, because it would not be "equitable" to single vessel owners and could "potentially force single vessels owners out of the fishery." (FMP Amendment 1 at 26–28.)

for vessels to harvest their full IFQs based on 22 eligible vessels in the fishery and an annual harvest limit of 400,000 bushels).)

**E. The Companies and Vessels Currently in the Surfclam Fishery**

In 2010, the first year the IFQ system was implemented, the 17 remaining harvesting companies controlled a total of 22 eligible vessels. That year, 16 of the 22 vessels eligible to participate in the Surfclam Fishery actually harvested surfclams. (Notice of Adoption at 13.)

In 2014, the total number of eligible vessels was reduced from 22 to 17 as a result of a regulatory action taken by DEC. (See discussion infra n.17.) Therefore, at present, each harvesting company now has a single eligible vessel. By 2016, only eight usable vessels remained in the Surfclam Fishery.

**1. The Eleven Plaintiff Harvesting Companies Controlled by Seawatch**

Eleven (11) of the seventeen (17) harvesting companies in Surfclam Fishery have common ownership and are affiliated with Seawatch and Truex Enterprises, Inc., related out-of-state entities that control processing facilities located outside of New York. (Dermont Aff. ¶ 3; Barnes Decl. ¶ 14; Affidavit of James Meyers ("Meyers Aff.") ¶¶ 4–5, ECF No. 2.) All eleven of these harvesting companies are Plaintiffs in this action.

As noted earlier, it appears that, by 2009, Seawatch had already gained control of nine or ten harvesting companies. In 2010, after the IFQ system was adopted, Seawatch purchased Doxsee Sea Clam Co. ("Doxsee"), which, at the time, had two eligible vessels in the Surfclam Fishery. (Snead Reply Decl. ¶ 10 n.1; see also infra n.17.)

Only three of Seawatch's harvesting companies—Bay Head, Inc. ("Bay Head"); St. Peter Dock, Inc. ("St. Peter"); and Winter Harbor Brands, Inc. ("Winter Harbor"), currently own usable vessels that participate in the Surfclam Fishery. (Compl. ¶ 56.) The other eight harvesting

companies affiliated with Seawatch do not currently own usable vessels and it appears that their Surfclam Permits (and the accompanying IFQ allocations for the Surfclam Fishery) are the "only true asset they hold."[12]  (Dermont Aff. ¶¶ 30, 46, 50.)  At least some of these eight harvesting companies had usable vessels in 2010.  (See, e.g., Snead Decl. ¶¶ 63, 64 n.17; Snead Reply Decl. ¶ 20; Dermont Aff. ¶ 31 n.4; Notice of Adoption at 13.)

As noted earlier, the regulations governing the Surfclam Fishery distinguish between permits for New York residents and permits for out-of-state residents.  The Seawatch-controlled harvesting companies are able to retain their New York resident permits by setting up a structure in which the harvesting company is owned by a New York state shell corporation, which is, in turn, owned by an out-of-state entity that is affiliated with and controlled by Seawatch.  (Barnes Decl. ¶ 13; Snead Decl. ¶¶ 73–74; Dermont Aff. ¶ 3.)

### 2.  Edgar and Fernandez – Two Plaintiff Harvesting Companies Affiliated with Another Out-of-State Processor

Two other harvesting companies, Edgar Seafood Products, Inc., ("Edgar") and Fernandez and Family, Inc. ("Fernandez"), are owned by a different common owner, Maxi Cohen.  (Barnes Decl. ¶ 14; Aff. of Maxi Cohen ("Cohen Aff.") ¶ 4, ECF No. 2.)  Both Edgar and Fernandez are Plaintiffs in this action.

Cohen acquired Edgar in 1999.  (Cohen Aff. ¶ 4.)  In 2011, after the IFQ system was adopted, Cohen acquired Fernandez.  (Id.)  Although Cohen is a New York resident, Edgar and Fernandez sell their harvests to an out-of-state processor owned by Cohen's brother.  (Snead Reply Decl. at 6 n.1; Cohen Aff. ¶ 12; Shriver ¶ 9.)  Edgar and Fernandez do not own vessels that are

---

[12] These eight harvesting companies are Aqua Harvesters, Inc.; C. Seaman Seafood, Ltd.; Freeport Sea Clam Co., Inc.; Lady Kim, Inc.; Lyons Fisheries, Inc.; Off Shore Diving Corp.; PEK Clam Co., Inc.; and Doxsee.  The eleven harvesting companies affiliated with Seawatch will be referred to hereinafter as "the Seawatch-controlled harvesting companies."

currently able to participate in the Surfclam Fishery. (Cohen Aff. ¶ 4.) At present, the sole business of both Edgar and Fernandez appears to be holding their Surfclam Permits (and IFQ allocations) and leasing vessels from other companies to have these IFQs harvested.

### 3. The Four Independent Harvesting Companies – Ocean Fresh, Shellfish, SMJ, and Verbeke

#### i. Verbeke and SMJ

Two of the independent businesses, Verbeke, Inc. ("Verbeke") and SMJ Products Corp. ("SMJ"), do not own usable vessels that currently participate in the Surfclam Fishery. (Aff. of Jack Collins ("Collins Aff.") ¶ 3, ECF No. 2; Aff. of John Verbeke ("Verbeke Aff.") ¶ 4, ECF No. 2.) Instead, both Verbeke and SMJ have leased vessels owned by the Seawatch-controlled harvesting companies (as well as other vessels) in order to have those vessels harvest their IFQs. (Barnes Decl. ¶ 15; Verbeke Aff.; Dermont Aff. ¶ 9; Snead Reply Decl. ¶ 20.) SMJ has not owned its own usable vessel since 1997 and Verbeke has not owned its own usable vessel since 1998. (Collins Aff. ¶ 3; Verbeke Aff. ¶ 4.) Both Verbeke and SMJ are Plaintiffs in this lawsuit.

#### ii. Ocean Fresh and Shellfish – the Remaining Independent Owner-Operators

The remaining two independent harvesting companies—Ocean Fresh Seafood Inc. ("Ocean Fresh") and Shellfish Inc. ("Shellfish")—have consistently operated their own vessels in the Surfclam Fishery. (Barnes Decl. ¶ 15.) These two independent owner-operators are not Plaintiffs in this action.

### 4. Vessel-Owning Companies that Do Not Hold Surfclam Permits

Three of the eight vessels that currently operate in the Surfclam Fishery are owned by New York companies that do not have Surfclam Permits. Two of these companies, TMT Vessels (NY),

LLC ("TMT Vessels NY"), and American Pride Seafood, LLC ("American Pride") are Plaintiffs in this case.[13]

TMT Vessels NY is controlled by Seawatch and has leased/chartered its vessel, the *F/V Roberta Lee*, to harvesting companies in the Surfclam Fishery since 2011.[14] (Dermont ¶ 4; Myers Decl. ¶¶ 6–10.) The three Seawatch-controlled harvesting companies that own vessels—Bay Head, St. Peter, and Winter Harbor—also lease/charter their vessels to other harvesting companies, including the eight Seawatch-controlled harvesting companies that do not own usable vessels.

In 2013, American Pride purchased the *F/V Allegiance*—an old 45-foot clamming vessel from out of state—for $50,000 and spent $55,000 upgrading it so that it could be used in the Surfclam Fishery. (Aff. of Charles Corriss ("Corriss Aff.") ¶¶ 3–4, ECF No. 2.) American Pride began using the *F/V Allegiance* in the Surfclam Fishery in 2016. (Id. ¶ 5.) That year, Verbeke leased the *F/V Allegiance* so that it could harvest Verbeke's IFQ.[15] The *F/V Allegiance* is only 45 feet long and is less capable of economically harvesting surfclams than other vessels in the Surfclam Fishery. (Id. ¶ 4; Collins Aff. ¶ 6.)

---

[13] American Pride's vessel does not have a federal fishery endorsement. (Snead Decl. ¶ 89). However, all the other vessels owned by Plaintiffs that are at issue in this action hold federal fishery endorsements pursuant to 46 U.S.C. § 12113. (Snead Decl. ¶¶ 86–100.)

[14] TMT Vessels NY, a New York corporation, was established in 2011 for the purpose of leasing the *F/V Roberta Lee* in the Surfclam Fishery. (Dermont Aff. ¶ 13.) At the time, Aqua Harvesters, Inc., one of the Seawatch-controlled harvesting companies, needed to replace its vessel, the *F/V Sharon Ann*. (Meyers Aff. ¶¶7–8.) The *F/V Roberta Lee* was originally owned by a New Jersey corporation controlled by Seawatch. (Dermont Aff. ¶¶ 54–56.) However, because of the Residency Rule, Seawatch had to set up TMT Vessels NY and transfer the *F/V Roberta Lee* to that entity so it could be used in the Surfclam Fishery. Because both the *F/V Sharon Ann* and the *F/V Roberta Lee* are over 70 feet long, the *F/V Roberta Lee* had to use the *F/V Sharon Ann*'s one-time replacement under the 70-Foot Rule in order to replace it. (See List of Exempt Vessels, DEPARTMENT OF ENVIRONMENTAL CONSERVATION, https://www.dec ny.gov/outdoor/77989 html (last visited on July 11, 2019); Certificate of Documentation for the *F/V Roberta Lee*, Compl. Ex. D.)

[15] When a company that owns a vessel leases it to a harvesting company that holds a Surfclam Permit, the vessel owner "actually harvests the clams for the harvesting company, under the latter's Surf Clam Permit." (Pls.' Reply Mem. at 22; see also Corriss Aff. ¶ 6 (indicating that when the *F/V Allegiance* harvested Verbeke's IFQ, American Pride, the owner of the *F/V Allegiance*, simply paid Verbeke a fee of $1.50 per bushel of surfclams for the right to harvest under Verbeke's permit and that Verbeke played no role in the actual harvesting).)

The third company that owns a vessel used in the Surfclam Fishery, but does not hold a Surfclam Permit, is Freeport Fish Dock, Inc. ("Freeport Fish"). (Snead Decl. ¶ 64.) Freeport Fish owns the *F/V Asherah*, which holds a federal fishery endorsement. (Id. ¶ 90.) Freeport Fish is not a plaintiff in this action. It appears that the *F/V Asherah* first entered the Surfclam Fishery in 2014. (Decl. of Brooks Dermont ("Dermont Aff.") ¶ 30, ECF No. 2.) The *F/V Asherah* harvested SMJ's IFQ in 2016. (Collins Aff. ¶ 6.) The record does not indicate which, if any, IFQs the *F/V Asherah* harvested in 2014 or 2015.

## F. Cooperative Harvesting Between 2011 and 2015

In 2011, at the urging of 16 out of the 17 harvesting companies, New York State passed the "Cooperative Harvesting Law" and the "Consolidation Law." See Harvesting—Clams—Quahogs, 2011 Sess. Law News of N.Y. Ch. 158 (A. 5347–A) (McKinney's); (Snead Decl. ¶¶ 15, 53–59.) The Cooperative Harvesting Law superseded DEC's regulations and allowed holders of Surfclam Permits to use any eligible vessel in the Surfclam Fishery to harvest their IFQs. (Id.; Barnes Decl. ¶ 18; Snead Decl. ¶¶ 56–59.) This allowed certain vessels to harvest multiple IFQs. (Barnes Decl. ¶ 20.) The Consolidation Law allowed harvesting companies with multiple vessels (and, thus multiple IFQs) to consolidate those IFQs onto one of its vessels. (Snead Decl. ¶ 15.)

The Cooperative Harvesting Law took effect in July 2011 in the midst of the clamming season. 2011 N.Y. Sess. Laws ch. 158 (A. 5347-A) (McKinney's) In 2011, only 11 vessels harvested in the Surfclam Fishery. (Notice of Adoption at 13.) During both 2012 and 2013, only 7 vessels participated in the Surfclam Fishery. (Barnes Decl. ¶ 20.) During this period, the vessels controlled by Seawatch each harvested 3 to 5 IFQs and, in total, 20 of the 22 IFQs were harvested from vessels controlled by Seawatch. (Id.) The two independent owner-operators, however, were each only able to harvest a single IFQ from their vessels. (Id.) During 2012 and 2013, the

independent owner-operators either did not harvest due to lack of food markets controlled by out-of-state processing plants or were limited to selling their surfclams to the bait markets." (Id.; see also Snead Decl. ¶ 67.) DEC maintains that, under this system, the independent owner-operators "were at a significant disadvantage and could not economically compete with the larger corporate participants that controlled the majority of the State's surfclam quota." (Barnes Decl. ¶ 20.)

It appears that because Seawatch (along with Edgar and Fernandez) control such a large share of the IFQs, if there is weak demand in the edible clam market, these processors may be able to fill their supply needs from the Surfclam Fishery with the IFQs they control (along with, if necessary, the IFQs of Verbeke and SMJ, possibly on harvested on Seawatch-controlled vessels).[16] This may leave the independent owner-operators that operate their own vessels potentially shut out of the edible clam market.

The Cooperative Harvesting Law and the Consolidation Law contained sunset provisions and expired at the end of 2013. (Barnes Decl. ¶ 21; Snead Decl. ¶ 58–59.) In 2014, 17 eligible vessels and 17 harvesting companies remained in the Surfclam Fishery.[17]

Despite the sunset of the Cooperative Harvesting Law and FMP Amendment 1's stated intention to preclude a single vessel from harvesting more than one IFQ, the Plaintiff harvesting companies were, in 2014 and 2015, able to devise a method to continue a form of cooperative harvesting. Specifically, the Plaintiff harvesting companies were able to utilize the Replacement

---

[16] Notably, SMJ had not harvested at all between 1998 and 2011 and only began doing so again once in 2012 after the Cooperative Harvesting Law took effect. (Collins Aff. ¶ 3.)

[17] After the sunset of the Cooperative Harvesting Law and the Consolidation Law in 2013, three of the Seawatch-controlled harvesting companies—which owned eight vessels in total—ended up losing five of their eligible vessels in the Surfclam Fishery (and thus, lost five IFQs) as a result of regulatory action by DEC. This is why the number of eligible vessels in the Surfclam Fishery fell from 22 in 2010 to the 17 eligible vessels that are currently in the Surfclam Fishery. See Bay Head, Inc. v. New York State Dep't of Envtl. Conservation, 43 Misc. 3d 1215(A), 990 N.Y.S.2d 436 (Sup. Ct. 2014), appeal granted, order aff'd as modified, 138 A.D.3d 905, 30 N.Y.S.3d 655 (2d Dep't 2016); (see also December 20, 2013 Aff. of Deborah Barnes ¶¶ 3–4, Snead Decl. Ex 1.) This regulatory action is not at issue in the instant suit.

Rule in a manner that allowed them to harvest multiple IFQs with a single vessel through "cross-replacement of swapping of eligible vessels amongst surfclam permits" and lease/charter agreements. (Barnes Decl. ¶ 24; see Snead Decl. ¶ 65.)

In 2014 and 2015, the vessels owned by Seawatch-controlled companies each harvested multiple IFQs. (Snead Decl. ¶ 63; see also Barnes Decl. ¶ 24 (indicating that in 2014, 11 IFQs were "held by 5 vessels with common ownership" and that in 2015, 10 IFQs were "held by 3 vessels under common ownership"). Thus, the Plaintiff harvesting companies were able to continue cooperatively harvesting their IFQs through a creative invocation of the Replacement Rule. Shellfish was also able to use this leasing technique to cooperatively harvest Verbeke's IFQ in 2015 and a portion of Edgar's IFQ in 2016. (Cohen Aff. ¶¶ 6–7; Verbeke Aff. ¶ 8.)

DEC maintains that the Replacement Rule had not previously been used in this fashion, and that "very few vessel replacements were requested by permit holders prior to 2014 and most of those replacements involved the permanent replacement of the eligible vessel with a more seaworthy, oceangoing vessel that was not participating in the fishery at that time."[18] (Notice of Adoption at 13.) According to DEC, cooperative harvesting through "cross-replacement" under the Replacement Rule has allowed the 11 Seawatch-controlled harvesting companies to "reap the economic benefits of consolidating their IFQs onto a few vessels and to save the additional costs imposed by needing to maintain a separate vessel to harvest each IFQ." (Barnes Decl. ¶ 25.)

---

[18] As Plaintiffs point out, Verbeke used the Replacement Rule to obtain, in certain years, different vessels to harvest its Surfclam Permit. (Verbeke Aff. ¶¶ 3–4, 8.) However, there is no evidence that the type of cross-replacement and lease/charter arrangements seen in 2014 and 2015 were used, in prior years, in the same fashion or with the same type of frequency. For example, there is no evidence that, under the pre-IFQ regime, cross-replacement and lease/charter arrangements were employed to allow a single vessel to harvest the weekly catch limits for multiple eligible vessels within the same week.

**G.  Adoption of the Single Vessel Rule and Plaintiff's Attempts to Overcome that Rule**

In order to stop the practice of "cross-replacement" and to close this loophole in the regulations, DEC adopted the "Single Vessel Rule," a series of amendments to DEC's regulations governing the Surfclam Fishery.  DEC first proposed the Single Vessel Rule in December 2015 and then adopted the Single Vessel Rule on July 26, 2016.  (Notice of Proposed Rule Making, NYS Register/December 16, 2015, Complaint Ex. K; Notice of Adoption.)

The Single Vessel Rule explicitly prevents any vessel from taking more than one IFQ allocation of surfclams during any calendar year.[19]  See, e.g., 6 N.Y.C.C.R.R. § 43-2.6(b); 6 N.Y.C.C.R.R. § 43-3.5(d).

Plaintiffs maintain that it is not economically feasible to acquire a clamming vessel (or to outfit a non-clamming vessel for clamming) in order to harvest only one IFQ because a single IFQ yields only $20,000 to $30,000 in profit.  (See, e.g., Snead Decl. ¶¶ 12, 23; Collins Aff. ¶ 11; Cohen Aff. ¶ 11.)  According to Plaintiffs, purchasing a new clamming vessel or retrofitting a vessel for surf-clamming can costs hundreds of thousands of dollars and, once configured as a surfclam vessel, such a vessel cannot be easily converted for use in other types of fisheries.  (Snead Decl. ¶ 4; Dermont Aff. ¶ 16; see also Corriss Aff. ¶ 3–4 (indicating that American Pride purchased and repaired a clamming vessel for $105,000).)

Accordingly, the twelve harvesting companies that do not currently own usable vessels have to lease a clamming vessel to harvest their IFQ.  (Snead Decl. ¶ 13.)  However, at present, there are only eight clamming vessels operating in the Surfclam Fishery.  A total of five of those vessels are owned by harvesting companies.  Three of those five vessels are owned by Seawatch-

---

[19]  In 2014, DEC attempted to accomplish the same action through administrative guidance rather than through formal rulemaking.  DEC ultimately abandoned that effort after a number of harvesting companies challenged DEC's actions in state court.  (Snead Decl. ¶¶ 60–62.)

controlled harvesting companies—Bay Head, St. Peter, and Winter Harbor. Two of those vessels are owned by Ocean Fresh and Shellfish, the two remaining independent owner-operators. The remaining three vessels in the Surfclam Fishery are owned by New York companies that do not have permits to harvest surfclams—TMT Vessels NY, American Pride, and Freeport Fish. Again, TMT Vessels NY is controlled by Seawatch.

The Residency Rule prohibits the harvesting companies, which all have New York resident Surfclam Permits, from using vessels that are owned by out-of-state residents. This means that, at present, there are only three New York clamming vessels—the ones owned by TMT Vessels NY, American Pride, and Freeport Fish—available to the twelve harvesting companies that do not own a usable vessel. Therefore, nine of those harvesting companies contend that they will not harvest their IFQs because of the Single Vessel Rule. Again, although these harvesting companies could purchase their own vessels, they maintain that purchasing a clamming vessel to harvest a single IFQ is not economically feasible.

To remedy the shortfall of vessels in the Surfclam Fishery, some of the Seawatch-controlled harvesting companies sought to lease, through use of the Replacement Rule, five clamming vessels from LET Vessels, LLC ("LET Vessels NJ"), a New Jersey corporation controlled by Seawatch. (Snead Decl. ¶¶ 92–100; Meyers Aff. ¶ 12; Comp. Exs. E, G; Compl. ¶ 104 n.7.) DEC, however, rejected these replacement attempts on two separate grounds, finding that the use of each of these vessels in the Surfclam Fishery was barred by: (1) the Residency Rule because they are all from out-of-state; and (2) the 70-Foot Rule because all of these vessels are over 70-feet long and were not grandfathered in under the 70-Foot Rule. (Vessel Replacement Denial Letters, Complaint Ex. G.; Compl. ¶ 104 n. 7.)

Thus, as it now stands, Plaintiffs claim that nine harvesting companies will be unable to harvest their IFQs because of the Single Vessel Rule.

## H. Additional Background Concerning the Single Vessel Rule and the 70-Foot Rule

### 1. Single Vessel Rule

#### i. DEC's Justifications for the Single Vessel Rule

When the Single Vessel Rule was first proposed, DEC stated that it was necessary to "minimize the potential for monopolization of the State's annual surfclam quota by a few vessels" and to minimize the "unfair market advantage held by a certain sector of the fishery." (Notice of Proposed Rule Making at 4–5.) DEC also stated that not adopting the Single Vessel Rule would "negatively impact the economic viability of small businesses in fishery" and "will likely force independently owned vessels (traditional New York-based commercial surfclam fishermen) to drop out of the fishery due to economic hardship from lack of markets for sale of surfclams." (Id. at 5.) DEC explained that this is "due to their inability to compete in the market with vessels having access to more than one quota." (Id. at 5.)

When DEC finally adopted the Single Vessel Rule, DEC also explained that "[t]he FMP and regulations . . . recognize that if some vessels do not fish or do not harvest their full IFQ, any uncaught clams will have a positive benefit by providing an additional conservation measure to help sustain the surfclam population in the Atlantic Ocean." (Notice of Adoption at 13.) DEC also indicated that it is "expected that surfclam permit holders involved in a limited-entry fishery with non-transferable IFQs must make an investment in a vessel capable of harvesting surfclams, either by maintaining their own vessel or purchasing or leasing a replacement vessel if they want to maintain eligibility in the fishery." (Id.) In its final Notice of Adoption, DEC also stressed that the Single Vessel Rule was consistent with FMP Amendment 1 whereas cooperative harvesting

was not.  (Id.)  As noted earlier, FMP Amendment 1 rejected measures that would have allowed a single vessel to harvest multiple IFQs, finding that such measures would not be "equitable" to single vessel owners and could possibly force them out of the Surfclam Fishery.

During the instant litigation, DEC further explained the rationales for the Single Vessel Rule set forth above.  According to DEC, the Single Vessel Rule attempts to preserve the "traditional" and "historic" "nature of the Surfclam Fishery to the greatest extent possible by maintaining an economically level playing field between single-vessel owners and consolidated vessel owners by ensuring that the distribution of fishing quota is fair for all participants." (Barnes Decl. ¶ 27; DEC Mem. in Opp. to Coast Guard Mem. at 2, 5, ECF No. 36.)  DEC maintains that the Single Vessel Rule ensures that a fleet of vessels comparable to the one that existed in 1993— when the Surfclam Fishery was primarily composed of individual owner/operators—will be maintained.  (DEC Mem. at 17, ECF No. 8; DEC Mem. in Opp. to Coast Guard Mem. at 5.) According to DEC, "[i]n the absence of the Single Vessel Rule, it would be possible for the entire Surfclam Fishery to be operated with only a very few harvesting vessels, which would fundamentally change the nature of the industry, and which would greatly disadvantage the few remaining individual owner/operators."  (DEC Mem. in Opp. to Coast Guard Mem. at 5; see Barnes Decl. ¶ 27.)

*ii.  Internal DEC Memoranda Cited by Plaintiffs*

Plaintiffs contend that, in promulgating the Single Vessel Rule, DEC was attempting to protect the in-state independent owner-operators at the expense of the harvesting companies which are affiliated with out-of-state entities.  (Snead Decl. ¶¶ 72–73.)  Plaintiffs were able to obtain internal DEC memoranda drafted, between December 2014 and June 2016, during the promulgation of the Single Vessel Rule.  These memoranda note, at various points, that the

independent owner-operators are "New York based" whereas other IFQ holders are "held under single ownership . . . with ties to Sea Watch . . . ([a] large out-of-state processing plant)" and have "corporate owners with ties to New Jersey interests." (DEC Internal Memoranda, Compl. Ex. L at NYSDEC000187–NYSDEC000190, Compl. Ex. M at NYSDEC000089, NYSDEC000060, NYSDEC000061, NYSDEC000045.) These DEC documents also state:

> • "The surf clam market is largely controlled by corporate interests who control the out-of-state surf clam processing plant which receives the majority of New York's surfclam harvest." (Compl. Ex. M at NYSDEC000060.)

> • "[Allowing cross-replacement of vessels under the Replacement Rule] creates an unfair market advantage for a certain sector of the fishery which is controlled by owners . . . aligned with Sea Watch International, the largest out-of-state surf clam processing plant. There is concern that the independently owned vessels (traditional New York based commercial surfclam fishermen) will be put out-of-business if quotas were transferable or could be consolidated." (Id. at NYSDEC000061.)

> • "This proposed rulemaking will be strongly opposed by the [companies controlled by Seawatch] but supported by the independent New York based vessel owners." (Id. at NYSDEC000060.)

> • "DEC also received public comment from Assemblyman Englebright that was generally supportive of the rule and need to protect traditional fisherman and family businesses on Long Island." (Id. at NYS DEC000045.)

## 2. The 70-Foot Rule

As explained earlier, the 70-Foot Rule bans fishing vessels over 70 feet long from fishing for any type of fish or shellfish in New York waters, but grandfathers in all vessels over 70 feet that were fishing New York waters when the statute was passed in 1997.

The passage of the 70-Foot Rule followed a 1986 statute that restricted fishing vessels to 90 feet in length, but was struck down in 1989 as a violation of the Dormant Commerce Clause by Judge Glasser in Atlantic Prince, Ltd. v. Jorling, 710 F. Supp. 893 (E.D.N.Y. 1989). In doing so,

Judge Glasser recounted various pieces of legislative history indicating that this law was intended to exclude out-of-state residents. See id. at 897, 901–902.

During the subsequent passage of the 70-Foot Rule, DEC explained the purpose of the legislation in a letter to the Legislature, which states:

> Because of the current over-exploited condition of most marine fisheries stocks, fishery managers, for the foreseeable future, will be actively reducing fishing effort in order to reduce exploitation rates and rebuild stocks. As fishing effort is reduced through such management actions, the harvesting capacity of the fishing fleets is not necessarily reduced proportionately. Therefore, a progressively smaller share of a diminishing harvest is available to the current harvesting fleet. Economic dislocation is inevitable under these circumstances.
>
> To compensate for the lost opportunity to harvest traditional species, fishermen frequently enter new fisheries, sometimes in new areas, thereby increasing the level of fishing effort in such new fisheries. New York State must recognize the potential for sudden unregulated growth in commercial fishing effort in New York's waters as a result of restrictions on commercial fishing elsewhere. This growth may also result from the availability in New York of a seasonal or local abundance of marine fish which could be exploited by vessels currently fishing elsewhere. Presently, commercial fisheries in the U.S. Exclusive Economic Zone off New England and the mid-Atlantic states are subject to numerous restrictions and limitations on new entry. A number of other states have also imposed moratoria or similar restrictions on new entrants which further limit the options of the east coast's mobile commercial fishing fleet. New York's marine waters are not able to support significant short term or long term increases of commercial fishing effort, particularly by large capacity offshore fishing vessels. Therefore, it is necessary to implement measures to prevent a significant or sudden increase in commercial capitalization or utilization of New York's marine waters beyond present levels.
>
> For these reasons, DEC has concluded that, in order to maintain the economic and social viability of the State's marine fisheries, action is required to prevent significant growth in commercial fishing effort. In the long run, permanent limits on commercial license eligibility and gear-specific effort limitations must be developed. It will take several years to acquire the necessary baseline data on gear use and effort in our marine fisheries, and to develop consensus among commercial fishers on the particulars of a license eligibility program that appropriately caps effort, while allowing for young people to enter the profession. This limitation on license eligibility will generally stabilize commercial effort at present levels. To prevent a disruptive influx to New York's waters of large offshore fishing vessels displaced [from offshore fisheries] by federal regulations, the bill includes a cap of 70 feet on the length of commercial fishing vessels, while grandfathering vessels

over that length presently fishing in State waters. This restriction is intended to apply equally to vessels from New York or from outside the State.

A complete, reliable data base on current commercial fishing effort, by gear type, location, and magnitude of effort is needed in order to develop long-term gear-specific effort limitations.

(DEC Letter Re: S.5410D, Compl. Ex. I.)

As noted earlier, in 2010, the 70-Foot Rule was amended to allow the grandfathered vessels that exceed 63 feet in length to be replaced once with a vessel that is 10-percent larger. N.Y. ECL § 13-0349. The legislative history for the 2010 amendment to the 70-Foot Rule includes two, largely identical Introducer's Memorandum in Support from the sponsors of the legislation in both the Senate and the Assembly. Both these memoranda state that the original 70-Foot Rule enacted in 1997 "was designed to prevent large out-of-state vessels from obtaining permits." (Introducer's Mem. in Support, Compl. Ex. J.) A memorandum from the Division of the Budget includes the same language. (Div. of the Budge Bill Memo., Compl. Ex. J.) The legislative history for the 2010 Amendment also includes a letter from a private commercial fishing organization from East Hampton, which notes that the "original intention of the [1997 statute] was to prevent large commercial ships from New England states from overharvesting fish stocks in New York waters." (Town of East Hampton Fisheries Committee and Consultancy Ltr., Compl. Ex. J.)

## I. **Procedural History**

In November 2016, prior to filing the instant action, the Seawatch-controlled harvesting companies, along with TMT Vessels NY and American Pride, filed an action in state court against DEC challenging the Single Vessel Rule (the "State Court Action"). (See American Pride Seafood, LLC v. New York State Dep't of Environmental Conservation, Sup. Ct., Suffolk County, Jan. 9, 2018, Index No. 10496/2016.) The plaintiffs in the State Court Action assert, inter alia, that the Single Vessel Rule is arbitrary and capricious and that it does not comport with the

mandate of N.Y. ECL § 13-0309(12) that requires DEC to "attempt to maintain the economic viability of . . . the traditional established New York based commercial surf clam/ocean quahog harvesting industry . . . that rely on this fishery." (See, e.g. American Pride Compl. ¶ 78, Decl. of Elizabeth Prickett Morgan, Ex. A, ECF No. 9.)

Subsequently, in March 2017, Plaintiffs filed the instant action in this Court alleging that: (1) the Single Vessel Rule, the Residency Rule, and the 70-Foot Rule are all preempted by federal law and also violate the Dormant Commerce Clause; (2) the Residency Rule violates the Privileges and Immunities Clause; and (3) the 70-Foot Rule and the Residency Rule violate the Equal Protection Clause. Plaintiffs filed the instant motion for a preliminary injunction seeking to enjoin enforcement of all three laws. DEC opposed the motion, arguing that: (1) this Court should abstain from hearing Plaintiffs' challenges to the Single Vessel Rule in light of the State Court Action; (2) Plaintiffs cannot show irreparable harm; (3) Plaintiffs' Dormant Commerce Clause claims are precluded by a 2005 federal statute; and (4) all of Plaintiffs' challenges fail on the merits. At a conference in April 2017, the Court requested that Plaintiffs, many of whom are also plaintiffs in the State Court Action, file an application for a preliminary injunction in state court. In January 2018, the state court denied the plaintiffs' motion for a preliminary injunction, finding that the plaintiffs failed to establish a likelihood of success on the merits. (ECF No. 25.) The state court also stayed the State Court Action "pending a resolution of" the federal action before this Court. (Id.)

In June 2018, the Court invited the United States Coast Guard, which had promulgated a regulation relevant to Plaintiffs' preemption claims, to weigh in on the preemption issues raised by Plaintiffs. The Coast Guard filed a response in August 2018 and, in September 2018, DEC filed a response to the Coast Guard's submission. The Coast Guard's response notes that "it is not

a party to this litigation, is not familiar with the factual background of this case and respectfully submits that it does not have sufficient information to make determinations upon which the Coast Guard's preemption conclusions would depend." (Coast Guard Mem. at 2, ECF No. 31.) With those caveats, the Coast Guard took the position that the Single Vessel Rule and the Residency Rule both appeared to be preempted. The Coast Guard declined to take a position on whether the 70-Foot Rule is preempted.

## II. DISCUSSION

### A. Overview

The first issue the Court must address is the threshold question of whether the Court should abstain from hearing Plaintiffs' challenges to the Single Vessel Rule in light of the pending State Court Action. Because, as explained below, abstention is not appropriate here, the Court must address the merits of Plaintiffs' federal challenges to both the Single Vessel Rule and the 70-Foot Rule. Plaintiffs' Dormant Commerce Clause claims concerning both rules are foreclosed, as DEC asserts, by a 2005 statute passed by Congress. As for preemption, Plaintiffs are unlikely to succeed on their claims that the federal fishery endorsements held by Plaintiffs' vessels preempt either law. Plaintiffs' equal protection challenge to the 70-Foot Rule is also unlikely to succeed. Given the Court's conclusions concerning the 70-Foot Rule, it is unnecessary for the Court to determine whether Plaintiffs are likely to prevail on any of their challenges to the Residency Rule.

### B. Colorado River Abstention

DEC argues that, pursuant to Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976), this Court should abstain from hearing any of Plaintiffs' challenges to the Single Vessel Rule given the pending State Court Action in which Plaintiffs have challenged the Single Vessel Rule on state law grounds.

"[A] federal court may abstain from exercising jurisdiction when parallel state-court litigation could result in 'comprehensive disposition of litigation' and abstention would conserve judicial resources." Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist., 673 F.3d 84, 100–01 (2d Cir. 2012) (quoting Colorado River, 424 U.S. at 817–18. "Suits are parallel when substantially the same parties are contemporaneously litigating substantially the same issue in another forum." Id. (quoting Dittmer v. County of Suffolk, 146 F.3d 113, 118 (2d Cir. 1998)). In evaluating whether abstention is appropriate under Colorado River, district courts must consider the following six factors:

> (1) whether the controversy involves a *res* over which one of the courts has assumed jurisdiction;
>
> (2) whether the federal forum is less inconvenient than the other for the parties;
>
> (3) whether staying or dismissing the federal action will avoid piecemeal litigation;
>
> (4) the order in which the actions were filed, and whether proceedings have advanced more in one forum than in the other;
>
> (5) whether federal law provides the rule of decision; and
>
> (6) whether the state procedures are adequate to protect the plaintiff's federal rights.

Id. (quoting Woodford v. Community Action Agency of Greene County, Inc., 239 F.3d 517, 522 (2d Cir. 2001)).

In weighing these factors, district courts must consider the "the heavy presumption favoring the exercise of jurisdiction[,]" Aventura Techs. Inc. v. World of Residensea II Ltd., 646 F. App'x 92, 94 (2d Cir. 2016), and the principle that "federal courts have a 'virtually unflagging obligation . . . to exercise the jurisdiction given them,'" Colorado River, 424 U.S. at 821 (quoting England v. Louisiana State Bd. of Medical Examiners, 375 U.S. 411, 415 (1964)). "Where a

Colorado River factor is facially neutral, that 'is a basis for retaining jurisdiction, not for yielding it.'" Niagara Mohawk, 673 F.3d at 101 (2d Cir. 2012) (quoting Woodford, 239 F.3d at 522).

As an initial matter, DEC's argument that this Court abstain under Colorado River is undermined by the fact that the state court, after rejecting the plaintiffs' motion for a preliminary injunction, stayed the resolution of the State Court Action pending the conclusion of the instant federal action before this Court. This fact alone is likely sufficient to deny DEC's abstention request. See, e.g., Lightwave Communications, LLC v. Verizon Services Corp., 503 F. Supp. 2d 713, 716 n.1 (S.D.N.Y. 2007) (declining to abstain under Colorado River where state court had already indicated that it would stay the state court action in favor of the federal action); Vladimir v. Cowperthwait, No. 06-CV-5863, 2007 WL 1964157, at *2 (S.D.N.Y. July 3, 2007) (denying defendants' request for a stay pursuant to Colorado River where "the state court action is presently stayed" and "[s]taying the federal action would, at least temporarily, preclude the plaintiff from proceeding in either forum on any claim for relief").

Moreover, the majority of the Colorado River factors either weigh in favor of Plaintiffs or are neutral. DEC focuses on the factors concerning "piecemeal litigation" and the order of filing. However, neither of these factors weigh in DEC's favor. Given the stay in the State Court Action, it is not necessary to abstain here to avoid piecemeal litigation, and the stay renders irrelevant the fact that the State Court Action was filed earlier than this federal suit. Further, the order of filing is not a factor that would, in any event, weigh greatly in DEC's favor given that there was little progress in the State Court Action prior to the stay.

Critically, not only does this federal action involve distinct federal claims concerning the Single Vessel Rule that are not even raised in the State Court Action, but it does not appear that the same issues underlie each action. DEC merely argues that both actions seek the same ultimate

relief—a ruling that the Single Vessel Rule is invalid. That, however, is not enough on its own to warrant abstention. And, it does not appear that the central issues in this federal action overlap with the issues in the State Court Action. As discussed further below, in this federal action, the Court must, inter alia, determine whether the Single Vessel Rule is preempted by the federal vessel documentation statutes—a preemption analysis, which, as explained below, may incorporate the standard of review that applies to challenges to state laws under the Dormant Commerce Clause. These are not issues in the State Court Action. Rather, the State Court Action concerns whether the Single Vessel Rule is arbitrary and capricious and whether the Single Vessel Rule violates the dictates of N.Y. ECL § 13-0309(12).[20]

Three of the remaining factors either weigh in Plaintiffs' favor or are neutral. In the instant case, federal law provides the rule of decision. Neither of the two actions involve a *res* over which one of the courts has assumed jurisdiction. And, each of the forums here are equally convenient. The only factor that weighs in favor of DEC is the fact that the state court is presumably adequate to protect Plaintiffs' federal rights. That alone, however, is not a basis to abstain in light of the analysis above. Accordingly, DEC's request for this Court to abstain under <u>Colorado River</u> is denied.

## C. <u>Standard for a Preliminary Injunction</u>

"When, as here, a preliminary injunction 'will affect government action taken in the public interest pursuant to a statute or regulatory scheme,' the moving party must demonstrate

---

[20] Plaintiffs assert in their reply papers that the Single Vessel Rule's focus on protecting the independent owner-operators is contrary to the directive in N.Y. ECL § 13-0909(12) that DEC take into account the "traditional established New York based commercial surf clam/ocean quahog harvesting industry . . . that rely on" the Surfclam Fishery. (<u>See</u> Snead Reply Decl. ¶¶ 8–17.) Plaintiffs, however, also appear to concede, in their reply brief, that their claims in the State Court Action, which appear to raise similar interpretive arguments about that state statute, "have no bearing on" the preemption and Dormant Commerce Clause challenges they assert here concerning the Single Vessel Rule. (Pls. Reply. Mem. at 9.) In any event, as discussed <u>infra</u>, the Court does not believe that the question of whether DEC properly interpreted state law in promulgating the Single Vessel Rule is one that this Court must resolve to decide Plaintiffs' federal claims. (<u>See</u> discussion <u>infra</u> pp. 67–69 & n.43.) If it were, that might be a reason to abstain. (<u>Id.</u>)

(1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton, 841 F.3d 133, 143 (2d Cir. 2016) (quoting Red Earth LLC v. United States, 657 F.3d 138, 143 (2d Cir. 2011) (citations and internal quotation marks omitted).

It is unnecessary to address the issue of irreparable harm because, as explained below, Plaintiffs have failed to establish a likelihood of success on all their claims concerning the Single Vessel Rule and the 70-Foot Rule. And, Plaintiffs have not shown that the Residency Rule alone caused them any harm because DEC denied the requests of LET Vessels NJ to introduce out-of-state vessels into the Surfclam Fishery based on both the 70-Foot Rule and the Residency Rule. Since the Court finds no basis to enjoin the 70-Foot Rule, it is unnecessary to address whether Plaintiffs can establish irreparable harm or likelihood of success concerning the Residency Rule. Even if Plaintiffs could show that the Residency Rule were likely to be found preempted or unconstitutional, DEC would still bar the out-of-state vessels owned by LET Vessels NJ because they do not comply with the 70-Foot Rule. Moreover, under these circumstances, the public interest factor would also weigh against granting any injunction as to the Residency Rule.

## D. **Dormant Commerce Clause**

Plaintiffs' challenges to all three rules under the Dormant Commerce Clause cannot succeed. In 2005, Congress passed the ''Reaffirmation of State Regulation of Resident and Nonresident Hunting and Fishing Act of 2005'' ("the Reaffirmation Act"). Pub. L. No. 109-13, 119 Stat. 289, § 6036 (2005). The Reaffirmation Act provides:

(b) DECLARATION OF POLICY AND CONSTRUCTION OF CONGRESSIONAL SILENCE.—

(1) IN GENERAL.—It is the policy of Congress that it is in the public interest for each State to continue to regulate the taking for any purpose of fish and wildlife within its boundaries, including by means of laws or

regulations that differentiate between residents and nonresidents of such State with respect to the availability of licenses or permits for taking of particular species of fish or wildlife, the kind and numbers of fish and wildlife that may be taken, or the fees charged in connection with issuance of licenses or permits for hunting or fishing.

(2) CONSTRUCTION OF CONGRESSIONAL SILENCE.—Silence on the part of Congress shall not be construed to impose any barrier under clause 3 of Section 8 of Article I of the Constitution (commonly referred to as the "commerce clause") to the regulation of hunting or fishing by a State or Indian tribe.

(c) LIMITATIONS.—Nothing in this section shall be construed—

(1) to limit the applicability or effect of any Federal law related to the protection or management of fish or wildlife or to the regulation of commerce.

Pub. L. No. 109-13, 119 Stat. 289, § 6036(b)–(c) (2005) (emphasis added). The impetus behind the Reaffirmation Act was to overcome Conservation Force, Inc. v. Manning, 301 F.3d 985 (9th Cir. 2002)—a decision that struck down a recreational hunting law on Dormant Commerce Clause grounds. See Dairy v. Bonham, No. 13-CV-1518, 2013 WL 3829268, at *2 (N.D. Cal. July 23, 2013). However, the plain text of the Reaffirmation Act is not limited to recreational hunting and fishing. See id. at *2 (concluding that the Reaffirmation Act barred Dormant Commerce Clause challenge to a commercial crabbing law). Because the Reaffirmation Act precludes Dormant Commerce Clause challenges to state laws that govern commercial fishing, all of Plaintiffs' claims under the Dormant Commerce Clause fail. See id.

**E.  Preemption**

**1.  Standard for Conflict Preemption**

"Since preemption claims turn on Congress's intent, we begin as we do in any exercise of statutory construction with the text of the provision in question, and move on, as need be, to the structure and purpose of the Act in which it occurs." Figueroa v. Foster, 864 F.3d 222, 232–33

(2d Cir. 2017). Conflict preemption occurs "where state law 'actually conflicts with federal law,' including where 'it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist., 673 F.3d 84, 95 (2d Cir. 2012) (quoting English v. Gen. Elec. Co., 496 U.S. 72, 79 (1990)).

### 2. Fishery Endorsements under 46 U.S.C. § 12113

All but one of Plaintiffs' vessels hold fishery endorsements pursuant to 46 U.S.C. § 12113, which states: "Subject to the laws of the United States regulating the fisheries, a vessel for which a fishery endorsement is issued may engage in the fisheries." [21] The term "fisheries" "includes . . . catching, taking, or harvesting fish, [or] shellfish . . . in the navigable waters of the United States," 46 U.S.C. § 108, which include state waters, 46 U.S.C. § 2101(23). Related regulations issued by the Coast Guard provide that: "A fishery endorsement entitles a vessel to employment in the fisheries . . . subject to Federal and State laws regulating the fisheries . . . ." 46 C.F.R. § 67.21. Federal fishery endorsements under 46 U.S.C. § 12113 are distinct from federal permits that may be obtained to catch fish in federal fisheries that are regulated by the federal government pursuant to the Magnuson-Stevens Fishery Conservation and Management Act ("MSFCMA"), 16 U.S.C. §§ 1801, et seq.

46 U.S.C. § 12113 is the latest iteration of the federal vessel documentation statutes, "which are an amalgam of statutory authorities and amendments spanning over two hundred years,

---

[21] A related statutory provision, 46 U.S.C. § 12112, concerns a different type of endorsement—specifically, "coastwise" endorsements. Section 12112, which uses similar language to the fishery endorsement provision, states: "Subject to the laws of the United States regulating the coastwise trade, a vessel for which a coastwise endorsement is issued may engage in the coastwise trade." As explained infra, while recent decisions addressing the preemptive effect of fishery endorsements are rather scarce, a handful of more recent decisions have analyzed the preemptive effect of "coastwise" endorsements.

starting with the 11th Act of the First Congress in 1789 and including the Jones Act of 1920." (Coast Guard Mem. at 1.)

Plaintiffs contend that all three state laws they challenge are preempted by the vessel documentation statutes and the fishery endorsements granted thereunder, which are held by the vessels owned by various Plaintiffs.

### 3. The Supreme Court's Decision in <u>Douglas v. Seacoast Products, Inc.</u>

The primary case addressing federal fishery licenses under the vessel documentation statutes is <u>Douglas v. Seacoast Products, Inc.</u>, 431 U.S. 265 (1977). <u>Douglas</u> interpreted a prior iteration of the federal vessel documentation statutes that granted vessels "licenses" for fisheries rather than "endorsements." However, as discussed <u>infra</u>, the subsequent changes to the federal vessel documentation statutes have not altered the substance of the endorsements under § 12113, which retain the same preemptive force as the "licenses" at issue in <u>Douglas</u>. (<u>See</u> Coast Guard Mem. at 2–5 (outlining history of the vessel documentation statutes).)

In <u>Douglas</u>, the plaintiff, an out-of-state corporation with foreign ownership, owned vessels that held federal fishery "licenses" and argued that these licenses preempted two Virginia statutes that only precluded non-residents and corporations with foreign ownership from fishing for menhaden in certain Virginia waters. The Supreme Court found that the plaintiff's federal fishery licenses preempted these Virginia statutes because they "subject[ed] federally licensed vessels owned by nonresidents or aliens to restrictions different from those applicable to Virginia residents and American citizens." <u>Douglas</u>, 431 U.S. at 286–87.

The <u>Douglas</u> Court acknowledged it was difficult, if not impossible to decipher the intent of Congress in enacting the federal vessel documentation statutes because there "is virtually no surviving legislative history" for the original Enrollment and Licensing Enrollment Act, which

was enacted in 1793.  Id. at 274–75.  The Court instead looked to the decision in Gibbons v. Ogden, 9 Wheat. 1, 6 L.Ed. 23 (1824), which was decided only three decades after passage of the Act and involved a license for the coasting trade issued under the same Act.[22]  Looking to Gibbons, its progeny, and the subsequent history of the vessel documentation statutes, the Court concluded that federal fishery licenses include the right to "tak[e]" fish in state waters, "subject to valid state conservation regulation."  Douglas, 431 U.S. at 282.  The Court in Douglas explained that:

> Although Gibbons is written in broad language which might suggest that the sweep of the Enrollment and Licensing Act ousts all state regulatory power over federally licensed vessels, neither the facts before the Court nor later interpretations extended that far.  Gibbons did not involve an absolute ban on steamboats in New York waters.  Rather, the monopoly law allowed some steam vessels to ply their trade while excluding others that were federally licensed.  The case struck down this discriminatory treatment.  Subsequent decisions spelled out the negative implication of Gibbons: that States may impose upon federal licensees reasonable, nondiscriminatory conservation and environmental protection measures otherwise within their police power.

Id. at 277 (emphasis added).  In discussing the permissibility of "reasonable, nondiscriminatory conservation and environmental protection measures," the Court cited prior cases that had upheld, in the face of federal licenses, evenhanded state laws that precluded all vessels in certain waters from using certain fishing gear.  Id.

In a footnote, the Douglas Court rejected Virginia's arguments that the challenged laws had legitimate conservation purposes to prevent overfishing and to assist Virginia in enforcing a net size restriction, which Virginia claimed would be impossible to enforce against non-residents because they do not land their catches in Virginia.  Id. at 285 n.21.  The Court found these claims "specious," explaining that, as to the former alleged conservation purpose, a "statute that leaves a State's residents free to destroy a natural resource while excluding aliens or nonresidents is not a conservation law at all."  Id.  In support, the Court cited a Dormant Commerce Clause decision,

---

[22]  The current analog of this license is a coastwise endorsement issued under 46 U.S.C. § 12112.

H. P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 538 (1949), for the proposition that a "state may not use its admitted powers to protect the health and safety of its people as a basis for suppressing competition."  The Court also rejected Virginia's justification for the net size restriction apparently because, inter alia, Virginia did not require its own residents to land their catches in Virginia and there was no proof in the record that any dockside inspections of net sizes occurred.  Douglas, 431 U.S. at 285 n.21; see Appellees' Br. at *48–50, Douglas, 431 U.S. 265 (1977) (No. 75-1255), 1976 WL 181573.

The Douglas opinion concludes with the following dicta:

> Our decision is very much in keeping with sound policy considerations of federalism. The business of commercial fishing must be conducted by peripatetic entrepreneurs moving, like their quarry, without regard for state boundary lines . . . . A number of coastal States have discriminatory fisheries laws, and with all natural resources becoming increasingly scarce and more valuable, more such restrictions would be a likely prospect, as both protective and retaliatory measures. Each State's fishermen eventually might be effectively limited to working in the territorial waters of their residence, or in the federally controlled fishery beyond the three-mile limit.  Such proliferation of residency requirements for commercial fishermen would create precisely the sort of Balkanization of interstate commercial activity that the Constitution was intended to prevent.  See, e. g., H. P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 532–539 (1949); cf. Allenberg Cotton Co. v. Pittman, 419 U.S. 20 (1974). We cannot find that Congress intended to allow any such result given the well-known construction of federal vessel licenses in Gibbons.

Douglas, 431 U.S. at 285–86.[23]

In Massachusetts v. Westcott, 431 U.S. 322 (1977), decided the same term as Douglas, the Court remanded, for further consideration in light of Douglas, a case where a non-resident who

---

[23] In a footnote, the Court cited examples of these "discriminatory" state laws, all of which explicitly discriminated, on their face, against non-residents in some fashion.  Douglas, 431 U.S. at 285 n.22.  Notably, one of these statutes was a New York law that precluded non-resident vessels from using certain trawling gear—that residents could use—unless the non-resident vessel's home state provided reciprocal privileges to New York residents.  See N.Y. ECL § 13-0335, ch. 644, § 2 (1972) (current version at N.Y. ECL § 13-0335 (2016)).  The current version of the same New York statute only permits non-residents to obtain "food fish" licenses if their home state offers reciprocal fishing privileges.  See N.Y. ECL § 13-0335 (2016).

held a federal fishery license challenged a Massachusetts law that prohibited non-residents from "dragging for fish by beam or otter trawl in Vineyard Sounds" for three months.

Douglas leaves several questions open. For example, it is unclear exactly what standards apply in determining whether a state law is "reasonable" and "nondiscriminatory" under Douglas. That issue and other arguments raised by the parties concerning the effect of Douglas are addressed below. Before delving into these questions, the Court will briefly survey the decisions interpreting federal endorsements after Douglas.

### 4. Decisions After Douglas

Only a few cases have addressed preemption claims involving federal fisheries licenses since Douglas was decided. See White Dove, Inc. v. Dir. of Div. of Marine Fisheries, 380 Mass. 471, 478–79 (1980) (indicating, in dicta, that Massachusetts regulation, which only allowed vessels that caught tuna using purse seine nets prior to 1974 to continue to do so, was unlikely be found preempted because the regulation did not provide preferential treatment to in-state residents and the prevention of overfishing is within the State's police power); Tangier Sound Watermen's Assoc. v. Douglas, 541 F. Supp. 1287, 1306 (E.D. Va. June 25, 1982) (holding that a Virginia law that only barred out-of-state residents from harvesting blue crabs in Chesapeake Bay was preempted by federal fishery licenses and also violated the Privileges and Immunities Clause); Ampro Fisheries, Inc. v. Yaskin, 247 N.J. Super. 111, 118, 588 A.2d 879, 883 (N.J. App. Div. 1991), aff'd in part, rev'd in part, 127 N.J. 602, 606 A.2d 1099 (1992) (finding that New Jersey law which limited all commercial fishing for menhaden to a certain distance off-shore was not preempted and explaining that although "a total prohibition of menhaden fishing in state waters might well run afoul of Ampro's federally licensed rights, the regulations here are not prohibitory but only regulatory, constituting a reasonable and nondiscriminatory conservation and

environmental protection scheme not substantially inconsistent with Ampro's federally-accorded rights") (citation omitted); Tart v. Com. of Mass., 949 F.2d 490, 501 (1st Cir. 1991) (finding that Massachusetts law barring fishermen from landing raw fish in Massachusetts without a state license was not preempted by a federal fishery license).

None of these cases directly address what standards the Court should apply in determining whether a challenged law constitutes a reasonable and non-discriminatory conservation measure under Douglas.[24] Also, with the exception of Tangier Sound, which—like Douglas—found a state statute that explicitly excluded only non-residents from a fishery in state waters to be preempted, these post-Douglas cases did not involve allegations that the state laws at issue discriminated (whether facially or in effect) against non-residents. Nor, with the exception of Tangier Sound, do these cases involve statutes that completely exclude certain fishermen or vessels from a particular fishery.

The First Circuit's decision in Tart is notable for one reason. As discussed further infra, DEC asserts that state laws avoid preemption under Douglas even if they are not conservation measures, provided that they effectuate other "legitimate local public interests." DEC is correct on this point. Douglas implies that not only do reasonable and nondiscriminatory conservation measures avoid preemption under the vessel documentation statutes, but so do reasonable and nondiscriminatory measures that effectuate any "legitimate local public interest." Douglas, 431 U.S. at 278 (quoting Huron Portland Cement Co. v. Detroit, 362 U.S. 440, 443 (1960)) (noting that, in Huron, the Court upheld a municipal smoke abatement law in the face of a coastwise

---

[24] The Coast Guard's submission indicates that 46 C.F.R. § 67.21, which states that "[a] fishery endorsement entitles a vessel to employment in the fisheries . . . subject to Federal and State laws regulating the fisheries," is, essentially, nothing more than a reiteration of Douglas's statement that states can impose reasonable and nondiscriminatory environmental conservation measures. (See Coast Guard Mem. at 9 ("The 'federal and state laws' language in 46 C.F.R. § 67.21 acknowledges to readers that the fishery endorsement is subject to . . . conservation measures ('regulating the fisheries').")).

license, finding it to be an "evenhanded local regulation to effectuate a legitimate local public interest"). Tart made clear the implication in Douglas, finding—not surprisingly—that federal fishery licenses did not preempt a Massachusetts law that barred fishermen from landing raw fish in Massachusetts without a state license because the state law "constitutes '[e]venhanded local regulation to effectuate a legitimate local public interest' in promoting public health by protecting Massachusetts consumers from exposure to seafood unfit for human consumption." Tart, 949 F.2d at 501 (quoting Huron, 362 U.S. at 443). The question of whether DEC's interest in protecting independent owner-operators in the Surfclam Fishery constitutes a "legitimate local public interest" is a separate issue that is addressed infra.

In addition to these cases involving federal fishing licenses, three more recent Court of Appeals decisions outside the Second Circuit have addressed the preemptive force of the related federal licenses and endorsements that concern "coastwise trade."

In Young v. Coloma-Agaran, the state of Hawaii barred all commercial vessels from using Hanalei Bay for any commercial purposes in order to avoid user conflicts in those waters. 340 F.3d 1053, 1055 (9th Cir. 2003). The plaintiff, whose tour boat held a federal endorsement for coastwise trade, challenged the state regulation as preempted.[25] The Ninth Circuit agreed with the plaintiff, finding that "the ban completely excludes the plaintiffs from conducting their federally-licensed tour boat businesses in Hanalei Bay" and that "the state's refusal to issue use permits under any conditions has effectively rendered it impossible for the plaintiffs to comply with both federal and state law in order to ply their trade." Id. at 1057 (emphasis added) (citing Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142–43 (1963)). The Ninth Circuit rejected the

---

[25] Prior to the promulgation of this regulation, Hawaii had "limited the number of use permits issued and imposed certain conditions on the activities of the permittees (e.g., setting numerical ceilings on passengers ferried and trips made)." Young, 340 F.3d at 1055.

state's argument that the law was a valid exercise of its police powers, explaining that because the ban "actually conflicts with the federal licensing scheme," the state's contention that the ban is an exercise of its concurrent police power is "immaterial to our analysis." Id. at 1057.

In UFO Chuting of Hawaii, Inc. v. Smith, the Ninth Circuit rejected a preemption challenge to a Hawaii statute that barred all parasailing activities in certain waters for five months out of the year to protect humpback whales during their mating season. 508 F.3d 1189, 1191 (9th Cir. 2007). The Ninth Circuit held that, unlike in Young, this law, which only banned parasailing for five months out of the year, did not "completely exclude federal licenses or actually conflict with federal law." Id. at 1194. The Ninth Circuit went to analyze whether the Hawaii law was a "reasonable, nondiscriminatory conservation and environmental protection measure" under Douglas. The court held that, in determining whether a statute is "reasonable" under Douglas, the same standard that governs rational basis review in equal protection cases should be applied. Id. at 1194–96. The court also concluded that, in determining whether a statute is "nondiscriminatory" under Douglas, the same standards used to analyze discrimination against interstate commerce under the Dormant Commerce Clause should apply. Id. at 1196. The court found that the facially neutral Hawaii statute passed muster under both tests because it advanced its purpose of protecting humpback whales, it did not discriminate against non-residents or non-citizens, the benefits of the statute were not illusory, and they did not indicate a favoritism to in-state industries. Id.

Prior to both Young and UFO Chuting, the Fourth Circuit decided Waste Management Holdings, Inc. v. Gilmore, 252 F.3d 316, 348 (4th Cir. 2001). In Waste Management, the Fourth Circuit addressed, at summary judgment, state laws concerning the shipment of garbage on Virginia's rivers. Id. at 238. The first rule—the "Three Rivers' Ban"—barred any vessel from transporting garbage on Virginia's three major rivers. Id. at 323. The Fourth Circuit held that this

rule was preempted because it completely excluded federally licensed vessels from engaging in this activity, and the "reasonableness of such a complete ban [was] simply not supported by the evidence in the record, even when viewed in the light most favorable to the Defendants." Id. at 348. The second rule—the "Stacking Provision"—prevented vessels from stacking containerized waste on a barge more than two containers high. Id. at 323. The Fourth Circuit found neither party was entitled to summary judgment on the question of whether the Stacking Provision was preempted because there were disputed factual issues concerning "the health and environmental risks associated with stacking sealed shipping containers containing [garbage] more than two high on barges." Id. at 348. Although the Fourth Circuit cited to Douglas's language concerning reasonable and nondiscriminatory conservation measures, the Fourth Circuit did not explain what standard it was applying to determine whether the laws at issue were reasonable. However, the Fourth Circuit's conclusion that the Three Rivers Ban was unreasonable and that a trial was necessary to resolve the reasonableness of the Stacking Provision suggests that the court was applying a standard of review more stringent than rational basis review. Id. Waste Management's rather abbreviated preemption analysis raises a number of questions, and it is difficult to reconcile all aspects of this decision with the Ninth Circuit's subsequent decision in UFO Chuting.[26]

---

[26] Waste Management also involved a Dormant Commerce Clause challenge to these two laws. In the context of the plaintiffs' Dormant Commerce Clause challenge, the Fourth Circuit concluded that these laws both had a discriminatory purpose and discriminated in practical effect. 252 F.3d at 335, 341. As such, the Fourth Circuit found that they were subject to strict scrutiny, meaning that the state had to show that these rules were the least discriminatory alternatives available to effectuate Virginia's proffered legitimate interest in protecting the health and safety of Virginia residents. Id. at 342. The court concluded that factual issues existed on the question of whether the Three Rivers Ban and the Stacking Provision survived strict scrutiny. Id. at 344.

The Fourth Circuit's different analyses of these laws for the plaintiffs' Dormant Commerce Clause and preemption claims leaves a number of questions unanswered. The Fourth Circuit did not explain why it did not analyze the preemption claims in terms of Douglas's "nondiscriminatory" prong given that the court had already found that the laws had a discriminatory purpose and discriminatory effect as part of its analysis on the Dormant Commerce Clause claims. Nor did the Fourth Circuit explain how, if at all, the inquiry into the reasonableness of the Stacking Provision would differ from the strict scrutiny analysis applied to the Stacking Provision as part of the Dormant Commerce Clause claim. The Fourth Circuit also did not explain why it found the Three Rivers Ban to be unreasonable in its preemption analysis, but that, nevertheless, factual issues existed on whether the Three Rivers Ban met strict scrutiny

## 5. Preemption Issues to be Addressed

The Court will now address, in turn, the following questions underlying Plaintiffs' preemption claims:

(i)  whether any other federal statutes have altered the preemptive force of federal fishery licenses and endorsements;

(ii) whether, under <u>Douglas</u>, state fisheries laws that completely exclude (or severely restrict the use of) federally endorsed vessels are, as Plaintiffs suggest, per se preempted even if they constitute reasonable and non-discriminatory measures that effectuate a legitimate local public interest;

(iii) whether protecting independent owner-operators is a legitimate local public interest or whether, as the Coast Guard asserts, DEC's concessions about the purpose of the Single Vessel Rule establish that it is protectionist, and, thus, preempted;

(iv) what standards should be applied in determining whether, under <u>Douglas</u>, a state law is reasonable and nondiscriminatory; and

(v) whether the Single Vessel Rule and the 70-Foot Rule survive under the standards applicable to Dormant Commerce Clause claims (which may be the applicable standard for analyzing <u>Douglas</u>'s "nondiscriminatory" prong).

## 6. Other Statutes Do Not Alter the Preemptive Force of Federal Fishery Licenses

The Court will first address DEC's threshold arguments that various statutory changes have altered the preemptive force of the licenses addressed in <u>Douglas</u>.  None of these arguments are persuasive.

As explained earlier, after various revisions to the federal vessel documentation statutes, the federal fishery licenses at issue in <u>Douglas</u> are now referred to as "endorsements."  Although DEC initially suggested that changes to these statutes may have altered their preemptive force,

---

for purposes of the Dormant Commerce Clause.  Notably, in <u>UFO Chuting</u>, both the Ninth Circuit and the district court below struggled to comprehend certain portions of the preemption analysis in <u>Waste Management</u>.  <u>See</u> <u>UFO Chuting</u>, 508 F.3d at 1193 n.3 ("Given that [<u>Waste Management</u>] was decided at least in part on the ground that the regulation was unreasonable, we do not find its holding with regard to complete exclusion particularly illuminating."); <u>UFO Chuting of Hawaii, Inc. v. Young</u>, 380 F. Supp. 2d 1160, 1165 (D. Haw. 2005) ("The Fourth Circuit's analysis of the reasonableness of the [the Three Rivers Ban] implicitly recognized that the regulation was not a complete ban.").

DEC now concedes that federal fishery endorsements are the current equivalent of the fishery licenses addressed in Douglas. (DEC Mem. in Opp. to Coast Guard at Mem. at 3; see also Coast Guard Mem. at 2–5.)

DEC, however, does maintain that the Reaffirmation Act altered the preemptive force of federal fishery endorsements. No cases have addressed this issue. In fact, it does not appear that any cases involving preemption claims and fishery endorsements have been decided since the Reaffirmation Act was passed in 2005. Although the Reaffirmation Act indicates that it is "the policy of Congress that it is in the public interest for each State to continue to regulate the taking for any purpose of fish and wildlife within its boundaries, including by means of laws or regulations that differentiate between residents and nonresidents," the explicit terms of the Reaffirmation Act indicate that it has no effect on Plaintiffs' preemption claims based on the vessel documentation statutes. Specifically, the Reaffirmation Act states that "[n]othing in [the Act] shall be construed . . . to limit the applicability or effect of any Federal law related to the protection or management of fish or wildlife or to the regulation of commerce." Pub. L. No. 109-13, 119 Stat. 289, § 6036(c) (2005). Section 12113 and the prior iterations of the federal vessel documentation statutes clearly "relate" to "the regulation of commerce." As such, the Court fails to see how the Reaffirmation Act can alter the preemptive force of federal fishery endorsements—the text of the Reaffirmation Act is clear that does it does not affect § 12113. See Figueroa, 864 F.3d at 232–33 ("Since preemption claims turn on Congress's intent, we begin as we do in any exercise of statutory construction with the text of the provision in question, and move on, as need be, to the structure and purpose of the Act in which it occurs.") (emphasis added).

DEC also asserts that the MSFCMA affects the preemptive force of federal fishery endorsements. This argument is not persuasive. Section 12113 states that a fishery endorsed

vessel's authorization to engage in the fisheries is "[s]ubject to the laws of the United States regulating the fisheries," which, admittedly, includes the MSFCMA. This "subject to the laws of the United States" language is allegedly critical because—according to DEC—the MSFCMA "explicitly reserves the right to all jurisdiction over fishing permits within state waters to the states" and, thus, "defers to the state" concerning state waters. (Oral Argument Tr. 19–20, ECF No. 24.) The flaw in this argument is that the MSFCMA does not explicitly grant states any authority to regulate the coastal waters that are within three miles from shore. Rather, the MSFCMA simply states that, with certain exceptions that are inapplicable to instant suit, "nothing in this chapter shall be construed as extending or diminishing the jurisdiction or authority of any State within its boundaries." 16 U.S.C. § 1856(a)(1). Thus, for purposes relevant to the instant suit, all § 1856 did was make it clear that the MSFCMA did not disturb existing state authority to regulate fishing within state waters three miles from shore. As such, the Court fails to see how the "subject to the laws of the United States language" of § 12113, when read in conjunction with § 1856 of the MSFCMA, alters the preemptive effect of the federal vessel documentation statutes that the Supreme Court recognized in Douglas. It is also notable that although the MSFCMA was enacted prior to Douglas, and is even noted in footnote in that decision, see Douglas, 431 U.S. at 286 n.24, nothing in Douglas indicates that the MSFCMA has eliminated the preemptive force of federal fishery licenses. Nor do any of the post-Douglas cases concerning fishery licenses, which were discussed above, suggest otherwise. Accordingly, the Court is not persuaded by DEC's argument concerning the MSFCMA.

**7. State Laws that Completely Exclude Endorsed Vessels or Severely Restrict Their Use Are Not Per Se Preempted**

The entirety of Plaintiffs' preemption argument in their opening brief concerning the Single Vessel Rule is as follows:

> The Single [Vessel] Rule is preempted by the authority granted to federally documented and fishery licensed vessels under the [vessel documentation statutes]. The Single [Vessel] Rule limits the use of the vessels owned by the plaintiffs . . . to harvesting of not more than one IFQ allocation in any harvest year. Each of these vessels is documented and "fishery" endorsed under the Shipping Act. Moreover, each vessel can harvest a single IFQ allocation in less than three-weeks. These restraints continue in force.
>
> Accordingly, the Single [Vessel] Rule effectively renders these vessels useless for over ninety-percent of the year, and while other harvesting in the Fishery could occur. [More importantly], the Single [Vessel] Rule deprives federally licensed vessels from being used in New York's waters for the only purpose they are built during that period. In accord with the analysis addressed in <u>Young</u>, the Single [Vessel] Rule is in direct conflict with the authority granted to these vessels under the [vessel documentation statutes] because it "effectively render[s] it impossible for the plaintiffs to comply with both federal and state law in order to ply their trade." <u>Young</u>, 340 F.3d at 1057.

(Pls.' Mem. at 19 (citation omitted).) Plaintiffs also invoke the same quotation above from <u>Young</u> in arguing that the other two laws at issues are preempted. Notably, the argument above concerning the Single Vessel Rule says nothing about whether the Single Vessel Rule is discriminatory under <u>Douglas</u>. Nor does it explicitly invoke the reasonableness prong of <u>Douglas</u>.

To the extent that Plaintiffs cite <u>Young</u> to argue that any state laws that completely exclude a federally endorsed vessel, or class of vessels, from a fishery (or severely restrict their use in a fishery) are per se preempted—even if the state law constitutes a reasonable and nondiscriminatory

measure that effectuates a legitimate local public interest—the Court disagrees.[27]  Such a rule—which would handcuff the ability of states, under their police power, to address manage their fisheries—cannot possibly be correct.

Admittedly, the Supreme Court has stated that a "state may not exclude from its waters a ship operating under a federal license." Huron, 362 U.S. at 447 (citing Gibbons v. Ogden, but also explaining that "[t]he mere possession of a federal license, however, does not immunize a ship from the operation of the normal incidents of local police power, not constituting a direct regulation of commerce").  However, neither this statement in Huron nor the Young decision support Plaintiffs' argument here.

The Ninth Circuit's decision in Young is factually distinguishable because Hawaii excluded all commercial vessels from Hanalei Bay.  Moreover, the Ninth Circuit's emphasis on the "state's refusal to issue use permits under any conditions" suggests that the Ninth Circuit may have upheld a regulation—such as Hawaii's earlier rule—that merely limited the number of use permits and, thus, only excluded certain vessels from Hanalei Bay.[28]  Young, 340 F.3d at 1057 (emphasis added).

---

[27] While Plaintiffs' briefs and the declaration of Plaintiffs' counsel appear to advance some semblance of such an argument, Plaintiffs' complaint is somewhat contradictory on this point.  At one point, Plaintiffs' complaint asserts that that "any state law or regulation that limits or prohibits the use of a documented and fishery endorsed vessel within any state" is preempted.  (Compl. ¶ 134.)  Plaintiffs' complaint, however, also alleges that "[v]essels that are fishery endorsed under the Shipping Act may be used anywhere in the United States for the purpose of commercial fishing or shellfishing, absent a legitimate and compelling local interest that warrants their preclusion from a particular fishery" and that the Single Vessel Rule "serves no legitimate or compelling local governmental, environmental, health, safety, police, or welfare function."  (Id. ¶¶ 134, 136 (emphasis added).)  To the extent Plaintiffs are arguing that the Single Vessel Rule is preempted because it does not serve a "legitimate and compelling local interest" or that "economic" concerns (as opposed to, for example, concerns about the peculiarities of local navigation) cannot be legitimate local interests under the vessel documentation statutes, any such arguments are addressed infra at pages 51–72.

[28]  To the extent that Waste Management has any persuasive force, none of three laws at issue here are analogous to the Three Rivers Ban in Waste Management, which completely excluded all vessels with federal coastwise trade licenses from transporting waste on Virginia's major rivers and which the Fourth Circuit characterized as a "complete ban."

Certainly, states can, as part of reasonable environmental protection measures, completely exclude certain endorsed vessels or classes of vessels.  See, e.g., Ray v. Atlantic Richfield Co., 435 U.S. 151 (1978) (Marshall, J. dissenting).[29]  The Court sees no reason why a state cannot similarly exclude certain vessels or classes of vessels as part of reasonable conservation scheme that it enacts to manage its fisheries.  Not only do Plaintiffs fail to cite any authority to the contrary, but, notably, the Coast Guard also disagrees with the notion that federal fishery endorsements per se preempt any state laws that completely exclude a particular fishery endorsed vessel or class of vessels from engaging in a state fishery.[30]  (Coast Guard Mem. at 8.)

The notion that the complete exclusion of any particular vessel or class of vessels is per se preempted would seem to undermine many reasonable fishing regulations.  For example, in Davrod Corp. v. Coates, the First Circuit rejected a Dormant Commerce Clause challenge to a state regulation that barred fishing vessels over 90 feet from state waters.  971 F.2d 778, 783 (1st Cir. 1992).  It is difficult to believe that this Massachusetts law and any other law that completely

---

[29] In Ray, the majority held that a state law, which banned any tanker exceeding 125,000 tons from the Puget Sound, was preempted by a different federal statute, the federal Ports and Waterways Safety Act of 1972 (the "PWSA").  Ray, 435 U.S. at 179 (majority opinion).  Although the plaintiffs in Ray also argued that this state law was preempted by the federal coastwide trade licenses held by the plaintiffs' vessels, the majority had no occasion to reach that question because it found the state law preempted by the PWSA.  Id.  However, Justice Marshall, whose dissent was joined by two other justices, disagreed with the majority's conclusion that the tanker size restriction was preempted by the PWSA.  Id. at 180 (Marshall, J., dissenting).  As such, Justice Marshall, who authored the majority decision in Douglas, had to reach the question of whether the tanker size restriction was preempted by the plaintiffs' coastwise trade licenses.  He concluded that the state law was not preempted because it "appears to be a reasonable environmental protection measure, . . . and it is imposed evenhandedly against both residents and nonresidents of the State."  Id. at 85 n.7 (Marshall, J., dissenting).

[30] As discussed above, the Court disagrees with the premise that the complete exclusion of a particular vessel or class of vessels is per se preempted by the vessel documentation statutes.  As such, Plaintiffs' apparent attempt to equate the restrictions on vessels imposed by the Single Vessel Rule to complete exclusions is irrelevant.  In any event, to the extent that complete exclusions have any particular relevance for purposes of preemption, it seems doubtful that the limitations placed on the vessel-owning Plaintiffs by the Single Vessel Rule are so restrictive that they are analogous to complete exclusions.  Cf. UFO Chuting, 508 F.3d at 1194 n.4 (finding Hawaii law that imposed a "significant restriction" on vessels with coastwise licenses by banning parasailing from certain waters for five months out of the year was not preempted, and not deciding whether "[a] longer ban or a ban on a different type of maritime business could result in such an economic impact as to make operation of its business wholly infeasible" and whether "such an impact would lead to preemption of a state regulation").

excludes certain vessels from being used in a particular fishery (or severely restricts the use of certain vessels) are per se preempted, irrespective of the reasonableness of such laws.

Plaintiffs nevertheless insist that all three of the challenged laws are preempted because they directly regulate, by "prohibition," Plaintiffs' vessels and determine what vessels are "eligible" to participate in the Surfclam Fishery. (Snead Decl. ¶¶ 104–107; Pls. Reply Mem. at 13; Oral Argument Tr. 2–4.) Plaintiffs argue that state laws cannot regulate vessels with federal fishery endorsements in such a manner. Plaintiffs suggest that this distinguishes the laws at issue here from other state fishing regulations that place restrictions on fishermen, such as IFQs, but do not tell the fishermen what vessels they can use to catch whatever fish their IFQs may otherwise entitle them to catch. (Oral Argument Tr. 3–4.)

This argument is not persuasive. Plaintiffs cite no authority indicating, in the context of a reasonable conservation scheme such as an IFQ system, that federal endorsements have such expansive preemptive force. Moreover, at least one case, White Dove, weighs against any such argument. In White Dove, the court indicated, albeit in dicta, that a Massachusetts regulation—which only allowed two vessels that had previously caught tuna using purse seine nets prior to 1974 to continue to do so—was unlikely to be found preempted. 380 Mass. at 478–79. Notably, the regulation in White Dove regulated the "vessels" themselves.

Plaintiffs' apparent theory—under which states would be preempted from determining which vessels (or class of vessels) are eligible to participate in a particular fishery—would restrict the ability of states to reasonably manage their fisheries in a host of ways. Fishery management schemes, such as IFQ systems, can involve numerous interlocking rules. If states cannot regulate what vessels can be used in their fisheries, their ability to manage those fisheries would be severely

limited.[31]  Plaintiffs' apparent theory—that if a harvesting company wants to hire any federally endorsed vessel to harvest an IFQ, DEC cannot prevent that from occurring—is not persuasive. The notion that Plaintiffs' federal endorsements have such expansive preemptive force within the confines of DEC's comprehensive regulation of the closed Surfclam Fishery—the very nature of which excludes many fishermen with federally endorsed vessels from participating in the fishery at all—is absurd.  As explained further below, once DEC imposes a reasonable conservation scheme—such as the IFQ system here—DEC is not preempted from crafting rules that determine what vessels can be used and place limits on the number of IFQs that each individual vessel can harvest.

For all the reasons above, the Court concludes that Plaintiffs are not likely to succeed on any arguments that any of the challenged laws are preempted simply because they exclude or severely restrict the use of certain endorsed vessels in the Surfclam Fishery.

### 8. The Coast Guard's Position Concerning the Single Vessel Rule

The Coast Guard takes the position that the federal vessel documentation statutes preempt any admittedly protectionist state fisheries laws.  Based on that premise, the Coast Guard opines

---

[31] Plaintiffs assert that, unlike the Surfclam Fishery, where IFQs are assigned to the eligible vessels, "no other fishery – state or federal – that uses an IFQ system identifies the IFQ to a vessel; rather, the IFQ is tied solely to the company or individual owner/holder of the IFQ, the vessel harvesting the IFQ being a wholly fungible piece of equipment."  (Snead Decl. ¶ 55.)  Plaintiffs' point, however, ignores the fact that certain federal fisheries, including, for example, the Pacific Halibut and Sablefish fishery in Alaska, place limits on the amount of fish that a single vessel can harvest in a season.  See, e.g., 50 C.F.R. § 679.42(h) (listing, for the Pacific Halibut and Sablefish fishery, harvest restrictions that single vessels cannot exceed, such as:  "No vessel may be used, during any fishing year, to harvest more than one-half percent for the combined total catch limits of halibut for IFQ regulatory areas 2C, 3A, 3B, 4A, 4B, 4C, 4D, and 4E").  The Pacific Halibut and Sablefish fishery also includes other provisions that protect owner-operators.  See National Research Council, Sharing The Fish: Toward A National Policy On Individual Fishing Quotas 73–74, 309–10 (1999).  For example, in that fishery, there are four categories of quota shares that correspond to four different vessel categories, some of which are based on vessel length.  50 C.F.R. § 679.40(a)(5)(iii)-(v); 50 C.F.R. § 679.42(a)(2).  Thus, for example, a fisherman with a category "C" sablefish quota share can only use that quota share/IFQ on a vessel that is less than or equal to sixty feet in length. 50 C.F.R. § 679.40(a)(5)(iv)(A); 50 C.F.R. 679.42(a)(2).  The Pacific Halibut and Sablefish fishery also places restrictions on who can acquire certain categories of quota share.  See 50 C.F.R. § 679.41(g).  Although the manner in which federal fisheries are managed under the MSFCMA is, of course, not dispositive on the question of what state law restrictions are preempted by the federal vessel documentation statutes, the fact that such measures are used in federal fisheries suggests, at the very least, that such measures are reasonable and may be necessary depending on the ancillary goals of a state's conservation scheme.

that both the Single Vessel Rule and the Residency Rule are likely preempted because DEC "appears to admit that they are protectionist and not 'conservation and environmental protection measures.'" (Coast Guard Mem. at 7.)  According to the Coast Guard, the Single Vessel Rule— which DEC admits was intended to "allow the remaining independently owned single-vessel operators to operate on an economically level playing field with their competitors"—conflicts with the federal vessel documentation statutes because it "preclude[s], <u>for economic reasons</u>, vessels that are otherwise entitled to fish in United States navigable waters."[32]  (<u>Id.</u> at 7 (emphasis added).)

In response to the Coast Guard's arguments, DEC asserts that "<u>Douglas</u> does not hold that all regulations other than environmental protection measures are preempted, but allows for regulation to serve any legitimate local public interest."  (DEC Mem. in Opp. to Coast Guard Mem. at 4.)  As explained earlier, the Court agrees with this general premise.

According to DEC, New York has a legitimate local public interest in attempting to preserve the "traditional" and "historic" "nature of the Surf clam Fishery to the greatest extent possible by maintaining an economically level playing field between single-vessel owners and consolidated vessel owners." (Barnes Decl. ¶ 27; DEC Mem. in Opp. to Coast Guard Mem. at 5.) DEC maintains that the Single Vessel Rule advances a legitimate local public interest by ensuring that a fleet of vessels comparable to the one that existed in 1993—when the Surfclam Fishery was primarily composed of independent owner-operators—will be maintained, which will prevent the

---

[32] One important caveat in the Coast Guard's position must be noted.  The Coast Guard states, at the outset of its brief, that the preemption issues here depend primarily on "whether the New York laws at issue are designed to protect New York commercial interests by discriminating against non-New York commercial interests." (Coast Guard Mem. at 1.)  However, the Coast Guard concedes that it "does not have sufficient information to make" such a determination. (<u>Id.</u>)  While DEC admits that the Single Vessel Rule is intended to benefit the independent owner-operator segment of the industry, DEC does not concede that the purpose of the Single Vessel Rule is to protect New York commercial interests vis-à-vis non-New York commercial interests.  Thus, the Coast Guard's ultimate analysis—which relies on DEC's concessions—does not squarely address the question of whether the Single Vessel Rule, a facially evenhanded regulation, was designed with a purpose to discriminate against out-of-state interests and, if so, what is the import of such a discriminatory purpose on the preemption analysis.  That issue is discussed <u>infra</u> at pages 58–70.

nature of the fishery from being fundamentally changed in a manner that would disadvantage the remaining independent owner-operators. (Barnes Decl. ¶ 27; DEC. Mem. at 17; DEC Mem. in Opp. to Coast Guard Mem. at 5.) DEC maintains that this is a legitimate local public interest— rather than "pure protectionism"—and, as such, should not be preempted under Douglas. (DEC Mem. in Opp. to Coast Guard Mem. at 5.) As explained below, the Court finds DEC's argument persuasive.

The Court agrees with the Coast Guard's position that the federal vessel documentation statutes generally preempt protectionist state laws concerning fisheries pursuant to the doctrine of obstacle preemption. (See Coast Guard Mem. at 6 ("[Obstacle preemption] is triggered if the New York state fisheries laws are protectionist. Allowing the State of New York to enforce laws that would preclude federally endorsed fishing vessels from fishing in New York waters would undermine the federal purpose of protecting the United States fishing fleet."); cf. Tart, 949 F.2d at 501 ("As it was not physically impossible for Tart to comply with both regulatory systems, Tart must show that enforcement of [the state law] would frustrate the underlying policy of federal licensure."). For example, if the Surfclam Fishery were generally unregulated—as it was in the 1980s when there was, inter alia, no cap on the annual harvest or the number of vessels—and DEC imposed a simple permit requirement on the Surfclam Fishery that allowed permit holders to take an unlimited amount of clams with as many vessels as they wanted, but only gave permits to a group of independent owner-operators (or some other favored group) in order to shield them from competitors, such a regulation might be preempted to the extent it excluded other fishermen with federally endorsed vessels. See Gibbons, 9 Wheat. 1, 6 L.Ed. 23 (finding steamboat monopoly granted by New York to one operator that excluded other federally licensed vessels was preempted); Douglas, 431 U.S. at 283 & 285 n.21. Certainly, such a scheme would seem to be

preempted if, as in <u>Douglas</u>, the favored group were any and all New York residents. However, this does not mean that—in fisheries which have been closed for years pursuant to bona-fide conservation schemes such as the Surfclam Fishery—a state is precluded from making choices in the design and management of such schemes that benefit one sector of a fishery over another, even at the expense of economic efficiency. In the context of DEC's management of the closed Surfclam Fishery, DEC's goal of protecting the independent owner-operators and preserving the historic nature of the Surfclam Fishery constitutes a legitimate local public interest. Or to put it another way, the Single Vessel Rule is permissible because, within the confines of its reasonable conservation scheme, DEC can pursue ancillary goals that it might otherwise be preempted from pursuing.

Indeed, Plaintiffs do not generally challenge the IFQ system—in which a total annual harvest limit is set and the rights to harvest those clams are then divided up equally amongst the 17 IFQs. Nor do they challenge DEC's decisions to close the Surfclam Fishery and only give Surfclam Permits to the harvesting companies that owned vessels and were harvesting in 1993—restrictions that continue to this day and which exclude other fishermen with federally endorsed vessels who might otherwise compete with the Plaintiff harvesting companies. No one disputes that these constitute reasonable conservation measures. The vessel documentation statutes do not preempt DEC from promulgating, within the context of this conservation scheme, a regulation such as the Single Vessel Rule that protects the independent owner-operator sector of the industry.

In an IFQ system, the annual harvest limit (or total allowable catch) is generally the primary conservation measure.[33] <u>National Research Council, Sharing The Fish: Toward A National Policy On Individual Fishing Quotas</u> ("Sharing the Fish") 20–21, 35–36 (1999). In such a system, the

---

[33] Of course, there can also be additional conservation measures such as limitations on the size of the clams or fish that can be harvested.

regulator first needs to devise the criteria for initially allocating the IFQs. (Id. at 142–67.) The regulator must also determine under what circumstances the IFQs can be utilized and transferred. A number of rules in an IFQ system may have no direct relationship to conservation and, instead, may be concerned with delineating the circumstances in which the IFQs can be used and transferred. (Id. at 167–74; see also supra n.31.) Any decision by a regulator in making these necessary determinations will likely benefit one sector of a fishery over another. As such, a regulator—in structuring either an IFQ regime or other types of conservation schemes that involve a limited number of permits—must determine what ancillary goals of the conservation scheme to prioritize. For example:

> The decision whether quota shares should be transferable [is] one of the critical design elements in the design of an IFQ program . . . . If economic efficiency and rapid downsizing are the primary goals of an IFQ program, transferability should be as free as possible. However, if other goals are more important, such as protecting an owner-operator mode of organizing production, preventing absentee ownership, or protecting fishery-dependent coastal communities, it may be necessary to restrict transferability—either geographically, between groups of fishermen, between bona fide fishermen and others, with respect to time, or possibly all of these.

Sharing the Fish 208. These concerns about the transferability of IFQs are similarly applicable to the question of which vessels can be used to fish those IFQs and how many IFQs each individual vessel can catch. (See supra n.31.)

Because any decision by a regulator concerning the rules governing the allocation, transferability, and utilization of IFQs (and the vessels that can harvest those IFQs) will likely benefit one sector of a fishery over another, a regulator must, in making these determinations, consider potentially competing values—some of which, such as economic efficiency, favor large vertically-integrated fishing conglomerates and others which favor independent owner-operators with single vessels. However, once a state decides to impose a reasonable conservation scheme to

manage a fishery, nothing in the precedent interpreting the vessel documentation statutes indicates that, in designing and managing such a scheme, states are required to prioritize economic efficiency as an ancillary goal over other ancillary goals, including protecting independent owner-operators.[34] This is particularly true when, as here, independent owner-operators originally comprised a majority of the fishery. DEC has a legitimate interest in enacting a measure, such as the Single Vessel Rule, that structures the IFQ system in a manner that protects the independent owner-operators and preserves the historic nature of the Surfclam Fishery.[35] Not only does the

---

[34] There appears to be no authority directly on point—either in cases involving the preemptive force of federal fishery licenses/endorsements or under the Dormant Commerce Clause—addressing what constraints those doctrines might impose on a state fisheries regulator's: (1) discretion to decide how to initially allocate IFQs or permits in a fishery closed as part of a conservation measure; or (2) discretion to restrict the transferability of such IFQs or permits and to impose restrictions on their use. However, decisions addressing challenges to other types of fishing regulations suggest that such a regulator would have broad discretion to weigh various competing interests in making those decisions. Cf. White Dove, 380 Mass. 471, 474, 476, 478–79 (indicating, in dicta, that regulation that only allowed the two vessels that had caught tuna using purse seine nets prior to 1974 to continue to do so—a regulation that looked to past participation and reliance interests as the relevant criteria for determining which vessels would be exempted from the general purse seine net ban— was unlikely to be found preempted); Connecticut ex rel. Blumenthal v. Crotty, 180 F. Supp. 2d 392, 401 (N.D.N.Y. 2001) (striking down, under the Dormant Commerce Clause, lobster permit regulation that required lobsterers who wanted to harvest in lobster fishery around Fishers Island to surrender their lobster permits from other states, but noting that, to pursue its purported goal of conservation, New York could adopt other measures, including, inter alia, limiting the number of lobster pots that each lobsterer could set and permitting lobsterers who harvested exclusively in the Fishers Island fishery to set up more pots than those who also harvested in other waters). Of course, DEC had to exercise such discretion when: (1) in 1993, it closed the Surfclam Fishery and had to decide the criteria for determining which fishermen would qualify for the limited number of Surfclam Permits; and (2) in 2003 and 2009, when DEC decided, in the FMP and Amendment 1 to the FMP, to continue to exclude new entrants from the fishery.

[35] Here, DEC adopted a regulatory regime where the Surfclam Permits are held by corporations rather than individuals and vessel replacement and leasing are allowed in certain circumstances. Such a system has various benefits, but it also allows the Surfclam Permits to be transferable in certain respects because they are held by corporations, whose ownership can change. Since DEC could have instead placed greater restrictions, at the outset, on the ownership of Surfclam Permits, DEC presumably also has the lesser power and discretion to allow corporate permit-holding and changes in corporate ownership, but to also blunt the negative impacts of such a scheme on the independent owner-operator sector of the fishery. To do so, DEC can adopt regulations such as: (1) the Single Vessel Rule, which forces all harvesting companies—that each owned usable eligible vessels when they were granted Surfclam Permits in 1993—to continue to compete on the same terms; or (2) the provisions in the pre-IFQ regime that, it appears, effectively required the harvesting companies to maintain usable vessels if they wished to harvest the weekly catch limit for their eligible vessel or vessels every week. Such regulations also have the effect of disincentivizing the acquisition and ownership of multiple Surfclam Permits by conglomerates such as Seawatch. Just as a fishery regulator may have a legitimate local interest in precluding or limiting transfers of permits or IFQs, a regulator may also have a legitimate local public interest in taking steps that disincentivize the acquisition and ownership of multiple Surfclam Permits.

Single Vessel Rule further a legitimate interest, it does so in an even-handed fashion that applies equally to all harvesting companies and vessel-owning companies in the fishery.

Relatedly, DEC is pursuing a legitimate local public interest when it promulgates a rule within the IFQ system, such as the Single Vessel Rule, which favors harvesting companies that have made, and continue to make, an investment in the fishery by maintaining their vessels. (See Notice of Adoption at 13 ("[I]t is also expected that surfclam permit holders involved in a limited-entry fishery with non-transferable IFQs must make an investment in a vessel capable of harvesting surfclams, either by maintaining their own vessel or purchasing or leasing a replacement vessel if they want to maintain eligibility in the fishery.").) When the Surfclam Fishery was closed in 1993, all the harvesting companies that received permits owned vessels that were, at that time, harvesting in the Surfclam Fishery. As such, it is reasonable for DEC, in the context of such a scheme, to structure the IFQ system in a manner that favors the harvesting companies in the Surfclam Fishery that continue to maintain usable vessels. Moreover, the pre-IFQ regime also appears to have had the practical effect of requiring every harvesting company to secure separate usable vessels if they intended to harvest the weekly catch limit for their eligible vessel or vessels. Nothing in the precedent interpreting the vessel documentation statutes indicates that those statutes require DEC to design its IFQ system in a manner that favors harvesting companies that have not maintained an investment in their vessels when, in 1993, the initial allocation of permits in the Surfclam Fishery were only given to companies that owned vessels that were harvesting in the Surfclam Fishery.

For all the reasons above, legitimate local public interests justify the Single Vessel Rule. As such, the Court declines to adopt the Coast Guard's position that the Single Vessel Rule is

admittedly protectionist and, thus, preempted because it precludes, "for economic reasons," federally endorsed vessels from each harvesting more than one IFQ.

### 9. The Single Vessel Rule Is Not Preempted Under <u>Douglas</u>'s "Reasonable" and "Nondiscriminatory" Prongs

As an initial matter, Plaintiffs' preemption arguments concerning the Single Vessel Rule do not explicitly assert that the Single Vessel Rule is discriminatory or unreasonable. (<u>See</u> Pls.' Mem. at 19 (citing only <u>Young</u> in discussion of Single Vessel Rule and arguing that the Single Vessel Rule "effectively render[s] it impossible for the plaintiffs to comply with both federal and state law in order to ply their trade."); <u>see also</u> Snead Decl. ¶¶ 41–42.) Accordingly, Plaintiffs may have waived any arguments that the Single Vessel Rule is either unreasonable or discriminatory under <u>Douglas</u>. In any event, as explained below, even assuming that Plaintiffs have not waived such arguments, the Court still finds that Plaintiffs are not likely to succeed in showing that the Single Vessel Rule is either unreasonable or discriminatory under <u>Douglas</u>.[36]

> #### i. The Single Vessel Rule Is Not Preempted Under <u>Douglas</u>'s Nondiscriminatory Prong

It is not clear what standard applies in determining whether a state law is discriminatory under <u>Douglas</u>. In <u>UFO Chuting</u>, the Ninth Circuit inferred from <u>Douglas</u> that the Supreme Court "sought to incorporate the same standards of 'nondiscriminatory' as it has applied in the context

---

[36] While Plaintiffs do not clearly raise any such arguments in the context of preemption, they do raise similar arguments in the context of their Dormant Commerce Clause challenge to the Single Vessel Rule. (Pls. Mem. at 21–25.) The Court also notes that Plaintiffs' opening brief raises additional, related arguments concerning the Single Vessel Rule in the section of its brief concerning the Privileges and Immunities Clause. (Pls. Mem. at 30–35.) (However, as DEC points out, Plaintiffs' complaint does not actually allege a Privileges and Immunities claim concerning the Single Vessel Rule.)

Although the Reaffirmation Act precludes Plaintiffs' Dormant Commerce Clause claims, the Ninth Circuit's decision in <u>UFO Chuting</u> indicates that <u>Douglas</u>'s "nondiscriminatory" prong incorporates a Dormant Commerce Clause analysis. Accordingly, in the discussion below, the Court has looked to the points that Plaintiffs raise in the context of their constitutional arguments concerning the Single Vessel Rule even though those constitutional arguments are not themselves viable.

of the [Dormant] Commerce Clause." 508 F.3d at 1196. In UFO Chuting, the Ninth Circuit ultimately concluded that the Hawaii law at issue, which was not even alleged by the plaintiff to discriminate against out-of-state interests, survived under a Dormant Commerce Clause analysis. UFO Chuting appears to be the only court to address the question of what standard should be employed to analyze Douglas's "nondiscriminatory" prong. And, it does not appear that any court has ever found a facially neutral state law such as the Single Vessel Rule to be preempted by the vessel documentation statutes based on discriminatory effects or a discriminatory purpose under a Dormant Commerce Clause analysis or otherwise.

While it is not certain that a Dormant Commerce Clause analysis is necessarily appropriate in the context of determining whether state fishing laws are preempted under the vessel documentation statutes, it is ultimately unnecessary to resolve the precise contours of Douglas's "nondiscriminatory" prong. Even assuming arguendo that the approach set out in UFO Chuting is correct and that the standards applicable to Dormant Commerce Clause claims govern the "nondiscriminatory" analysis under Douglas, Plaintiffs have not established a likelihood of success on this prong.

a. Standard for Dormant Commerce Claims

"In analyzing a challenged local law under the dormant Commerce Clause, [courts] first determine whether it clearly discriminates against interstate commerce in favor of intrastate commerce, or whether it regulates evenhandedly with only incidental effects on interstate commerce." Allco Fin. Ltd. v. Klee, 861 F.3d 82, 102–03 (2d Cir. 2017), cert. denied, 138 S. Ct. 926 (2018) (quoting Town of Southold v. Town of E. Hampton, 477 F.3d 38, 47–48 (2d Cir. 2007)) (internal quotation marks omitted).

A state law is "clearly discriminatory" if it: (1) discriminates against interstate commerce on its face; (2) harbors a discriminatory purpose; or (3) discriminates "in its effect." <u>Town of Southold</u>, 477 F.3d at 48. Clearly discriminatory laws are "virtually invalid per se and will survive only if [the defendant shows that] it is demonstrably justified by a valid factor unrelated to economic protectionism." <u>Allco Fin.</u>, 861 F.3d at 103 (quoting <u>Town of Southold</u>, 477 F.3d at 48) (internal quotation marks omitted). In other words, "such a law is valid only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." <u>Id.</u> (internal quotation marks omitted).

By contrast, where a state law is not clearly discriminatory but still adversely affects interstate commerce incidentally, courts analyze the law under the "deferential balancing test" set out in <u>Pike v. Bruce Church, Inc.</u>, 397 U.S. 137, 142 (1970). <u>Allco Fin.</u>, 861 F.3d at 103. Such a law will be sustained unless "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." <u>Id.</u> (quoting <u>Pike</u>, 397 U.S. at 142).

Although a finding that a law is clearly discriminatory subjects it to heightened scrutiny, the Supreme Court has "acknowledged, however, that 'there is no clear line separating the category of state regulation that is virtually per se invalid under the Commerce Clause, and the category subject to the <u>Pike v. Bruce Church</u> balancing approach.'" <u>Am. Booksellers Found. v. Dean</u>, 342 F.3d 96, 102 (2d Cir. 2003) (quoting <u>Brown–Forman Distillers Corp. v. N.Y. State Liquor Auth.</u>, 476 U.S. 573, 579 (1986)). Thus, for example, although "[e]ven facially neutral statutory provisions can be discriminatory 'in practical effect,'" <u>Atlantic Prince, Ltd. v. Jorling</u>, 710 F. Supp. 893, 896 (E.D.N.Y. 1989), it is often far from obvious when alleged discriminatory effects warrant heightened scrutiny. <u>Compare, e.g. id.</u> (finding that New York statute barring fishing vessels over 90 feet in length had both a discriminatory purpose and discriminated "in practical effect" because

it bore "disproportionately" on out-of-state fishermen as, at most, only one New York fishing vessel was adversely affected by the statute, but ten out-of-state vessels that sought to fish in New York were excluded by the statute's length restriction)[37] with Davrod, 971 F.2d 778, 787–91 (1st Cir. 1992) (finding Massachusetts regulation that excluded fishing vessels over 90 feet long—which New York's statute was modeled on—did not discriminate "in practical effect" because, generally, "Massachusetts fishing vessels longer than ninety feet greatly outnumber out-of-state vessels" and even though all of the over-90-foot vessels that were equipped for squid fishing were from out of state, there were over-90-foot Massachusetts vessels which, although not presently equipped for squid fishing, "could be converted to squid fishing"); Davrod, 971 F.2d at 796 (Coffin, J., dissenting in part) (asserting that the majority erred in analyzing discriminatory effect by not focusing on the impact of the statute on a "particular class of out-of-state interests—squid freezer-trawlers such as plaintiffs"); cf. Allco Fin., 861 F.3d at 103 ("[A]ny notion of discrimination assumes a comparison of substantially similar entities." (quoting Gen. Motors Corp. v. Tracy, 519 U.S. 278, 298–99 (1997))).

### b. Plaintiffs Are Unlikely to Prevail Under the Standards Applied to Dormant Commerce Clause Claims

Plaintiffs assert that the Single Vessel Rule discriminates in practical effect and has a discriminatory purpose. If Plaintiffs are correct, then DEC would have to show that the Single Vessel Rule is demonstrably justified by a legitimate local public interest. As explained below, even if Plaintiffs can show that the Single Vessel Rule discriminates in practical effect or has a discriminatory purpose, Plaintiffs would still not be likely to prevail.

---

[37] The court in Atlantic Prince determined that although there was evidence that "New York fishers were contemplating buying [over-90-foot] freezer-processor vessels at the time" the statute was enacted, it was not appropriate to consider that fact. The court reasoned that "Commerce Clause analysis, already rather complex, would become utterly bewildering if the courts were required to evaluate discriminatory effect by looking to 'potential' or 'prospective' burdens and benefit." Id. at 902 n.20.

According to Plaintiffs, the Single Vessel Rule discriminates, in practical effect, against interstate commerce and companies that have ties to out-of-state interests.

In arguing that the Single Vessel discriminates, in practical effect, Plaintiffs focus on the impact of the Single Vessel Rule on the Surfclam Fishery in 2016 when it first took effect. The Single Vessel Rule benefits the independent owner-operators, which are all purely in-state interests. The harvesting companies without usable vessels that are controlled by Seawatch and Cohen—which all have out-of-state ties—are all burdened by the Single Vessel Rule. However, so are SMJ and Verbeke—independent companies that have leased vessels from both Seawatch and other companies, but that are themselves purely in-state interests. Both SMJ and Verbeke are also Plaintiffs here. The four vessel-owning companies that are controlled by Seawatch (and which all have out-of-state ties) are also burdened by the Single Vessel Rule because, absent that rule, those companies could, through lease/charter arrangements, harvest multiple IFQs from other harvesting companies. However, the Single Vessel Rule also potentially burdens American Pride and Freeport Fish—the two independent companies that own vessels used in the Surfclam Fishery, but which do not hold Surfclam Permits. Neither of these two independent companies are controlled by out-of-state entities. In fact, American Pride is a Plaintiff in this action, challenging the Single Vessel Rule.

In asserting that the Single Vessel Rule was intended to discriminate against out-of-state interests, Plaintiffs rely on the internal DEC memoranda, which reference, at various points, the fact that the independent owner-operators are based in New York and the Seawatch-controlled harvesting companies have ties to entities based out of state.

While the evidence cited by Plaintiffs provides some support for their arguments concerning both discriminatory effect and purpose, other facts in the record cut against Plaintiffs' arguments. In the context of fisheries regulation, independent owner-operators appear to be a distinct segment of the industry from large vertically integrated fishing conglomerates. Thus, the fact that the Single Vessel Rule negatively impacts the Seawatch-controlled harvesting companies (which are all part of a large vertically integrated conglomerate) does not necessarily show that the Single Vessel Rule discriminates, in practical effect, against out-of-state interests. Moreover, the harvesting companies have always been required to identify an eligible vessel on their non-transferable Surfclam Permits and, similar to Single Vessel Rule, the pre-IFQ regime seemingly required every harvesting company to secure separate usable vessels for the season if they wished to harvest the weekly catch limit for their eligible vessel or vessels every week. It is also notable that although Plaintiffs focus on the alleged discriminatory effect of the Single Vessel Rule on Plaintiffs in 2016, the state of the Surfclam Fishery in 2009 and 2010—when Amendment 1 to the FMP's single vessel requirement was first adopted and took effect—appears to undermine, in some respects, Plaintiffs' claims that the Single Vessel Rule is discriminatory.[38] In any event, whether the focus is on the state of Surfclam Fishery in 2016 or 2009/2010, the record shows that the Single

---

[38] In 2009, 17 vessels harvested out of a total of 22 (or possibly 23) eligible vessels. And, in 2010, 16 vessels harvested out of a total of 22 eligible vessels. Thus, if one considers the impact of this single vessel requirement on the individual harvesting companies that did not have usable vessels, it is not clear that this single vessel requirement had much, if any, disparate impact on harvesting companies controlled by out-of-state entities. The record suggests that five or six harvesting companies may have lacked usable vessels in 2009 and 2010, and that a substantial portion of those companies may have been purely in-state interests that were not controlled by Seawatch or Cohen. For example, the record indicates that SMJ did not own a usable vessel and did not harvest during those years. And, there is no evidence that, in 2009 or 2010, Fernandez—which was not purchased by Cohen until 2011—had a usable vessel or ties to out-of-state interests. Moreover, Doxsee, which was not acquired by Seawatch until after FMP Amendment 1 was issued, had two eligible vessels and was, thus, also adversely affected, in some fashion by FMP Amendment 1's single vessel requirement. (See Snead Reply Decl. ¶ 11 n.1; see also supra n.17.) (If Doxsee had two usable vessels in 2010, it would have preferred to harvest both of its IFQs on a single vessel. And, if Doxsee only had one usable vessel at that time, it would have been burdened by the single vessel requirement with respect to its second IFQ in the manner as SMJ and any other harvesting companies that lacked usable vessels.)

Vessel Rule and the original single vessel requirement in FMP Amendment 1 also burden New York companies that are not controlled by Seawatch or Cohen. Cf. Atlantic Prince, 710 F. Supp. at 902 n.20 (E.D.N.Y. 1989) ("[C]ourts are far less likely to find a Commerce Clause violation where a statute visits some of its adverse effects upon in-state interests represented in the legislature."). These facts undercut the probative force of Plaintiffs' evidence concerning both discriminatory effect and discriminatory purpose.

In any event, even assuming that the Single Vessel Rule has a discriminatory effect or a discriminatory purpose (based on the refences to the respective entities' residencies in the internal DEC memoranda), Plaintiff are still unlikely to prevail.

ii.   The Single Vessel Rule Advances the Legitimate Local Interest of Protecting Independent Owner-Operators

The Court previously discussed, in the context of the Coast Guard's position, why protecting independent owner-operators and preserving the historic nature of the Surfclam Fishery is a legitimate local interest.

Plaintiffs also raise various arguments that appear to challenge DEC's claim that the Single Vessel Rule serves legitimate local interests. Plaintiffs assert, in the sections of their papers concerning their constitutional arguments, that the monopolization and resource protection rationales cited by DEC for the Single Vessel Rule are illusory and a sham and that these are all a cover for unlawful discrimination in favor of the independent owner-operators because they are purely in-state interests while the Seawatch-controlled harvesting companies are not. Plaintiffs also contend that DEC's purported concern with protecting independent owner-operators is nothing more than a "post-hoc rationalization." None of these arguments show that protecting independent owner-operators is not a legitimate local interest here.

First, Plaintiffs attack DEC's position that any IFQs that are not harvested as a result of the Single Vessel Rule will constitute an incidental benefit to the surfclam resource. (Pls. Mem. at 34–35.) Because protecting independent owner-operators is itself a legitimate local public interest, it is irrelevant whether any additional conservation benefits of the Single Vessel Rule—which DEC admits are only potential incidental benefits—would alone justify that regulation.

Second, Plaintiffs argue that DEC's alleged concern about the "monopolization" of IFQs is not supported by the factual record. This argument is also not persuasive. Plaintiffs take the position that there is not a monopoly in the Surfclam Fishery because, even when vessels are able to harvest multiple IFQs, the majority of the harvesting companies harvested and sold their harvests to either the edible clam market or the bait market. (Pls. Mem. at 33–34; Snead Reply Decl. ¶ 22.) Plaintiffs also argue that DEC has failed to offer sufficient evidence to show that the independent owner-operators are at an economic disadvantage and that their economic viability has been threatened by the cooperative harvesting that occurred between July 2011 and July 2016. (Snead Reply Decl. ¶ 13–15, 20, 22.) Plaintiffs appear to imply that, in light of the above, DEC has no need, at all, to protect the independent owner-operators. These arguments are all unpersuasive and do not undermine DEC's position that protecting independent owner-operators is a legitimate local interest in the circumstances here.

When vessels can harvest multiple IFQs, the independent owner-operators are at a disadvantage and may be harmed. DEC points to evidence that, when cooperative harvesting has occurred, the independent owner-operators have, at times, been shut out of the edible clam market. (See Barnes Decl. ¶ 20; see also FMP Amendment 1 at 13 (noting that, in 2009, "approximately 30% of the fishery [did] not have a market for their clams and therefore, are unable to fish for most of the year").) This has resulted, at times, in the independent owner-operators either selling to the

bait market or not harvesting at all.[39]  (Id.)  Moreover—contrary to Plaintiffs' suggestion—DEC

does not have to offer evidence establishing that the independent owner-operators are on the verge

of closing up their businesses in order to have a legitimate interest in protecting that sector of the

industry.

The fact that other harvesting companies have sold their harvests to the edible clam market

during cooperative harvesting and that, in certain years, even the independent owner-operators

may have also been able to sell their harvests to the edible clam market does not show that DEC

lacks a legitimate interest in protecting the independent owner-operators.  Nor does the fact that

the independent owner-operators may have, in certain years, been able to sell their harvests to the

bait market.  Not only does the bait market appear to be less profitable than the edible clam market,

but it is not clear that there is sufficient demand in the bait market to consistently purchase the

harvests of all of the independent harvesting companies.[40]  Additionally, the fact that Shellfish

cooperatively harvested one IFQ in 2015 and had contracted to cooperatively harvest the IFQs of

Edgar and Fernandez in 2016 also fails to show that DEC does not have a legitimate interest in

---

[39] Such evidence is not surprising because processors for the edible clam market will, under cooperative harvesting, only purchase from the independent harvesting companies if there is sufficient demand for the processors to fully exhaust their own IFQs.  And, even if there is some processor demand for the IFQs of the independent harvesting companies, it seems likely that Seawatch would, under cooperative harvesting, first harvest the IFQs of SMJ and Verbeke on the vessels that Seawatch controls before purchasing surfclams harvested by the two independent owner-operators.  DEC is not required to structure its IFQ system in a manner that favors a harvesting company such SMJ, which does not own a usable vessel and did not harvest at all between 1998 and 2011, over independent owner-operators that have maintained vessels and that may rely on the Surfclam Fishery for their livelihoods.

[40] Plaintiffs assert that, in 2016, the bait market for surfclams paid a higher price per bushel for surfclams than the edible clam market.  (Snead Decl. ¶ 77.)  However, not only is Plaintiffs' evidence concerning the allegedly higher price per bushel paid by the bait market in 2016 limited in various respects, (see Snead Decl. ¶ 67; Cohen Aff. ¶ 11; Corriss Aff. ¶¶ 6–7 (discussing sale of a single IFQ to the bait market)), but Plaintiffs' evidence concerning the bait market in other years besides 2016 contains little detail and does not even indicate the price paid per bushel by the bait market in other years, (see Dermont Aff. ¶¶ 9–10; Verbeke Aff. ¶ 8; Collins Aff.)  And, even assuming arguendo that Plaintiffs could establish that, in certain years, the bait market may be more lucrative than the edible clam market and has sufficient demand to purchase the harvests of all of the independent harvesting companies, the edible clam market would still be important, in other years, to the independent owner-operators.

protecting the independent owner-operators by enacting a rule such as the Single Vessel Rule.[41] Furthermore, the fact that, generally, protecting independent owner-operators and limiting the concentration of IFQs appear to often be of concern to fishery regulators further suggests that DEC's concerns here are legitimate local public interests. <u>See</u> <u>Sharing the Fish</u> 167–74; (<u>supra</u> n. 31).

Third, Plaintiffs argue that DEC's professed concern with protecting independent owner-operators is contrary to N.Y. ECL § 13-0309(12), which directs DEC to take into account the "economic viability of the traditional established New York based commercial surf clam/ocean quahog harvesting industry . . . that rely on" the Surfclam Fishery. (<u>See</u> Snead Reply Decl. ¶¶ 8–18; Pls. Reply Mem. at 1.) Plaintiffs maintain that "the State Legislature never provided the Defendants with authority to create regulations that distinguish . . . between the 'traditional' participants in this Fishery based on their ownership." (Reply Mem. at 1; <u>see also</u> Snead Reply Decl. ¶¶ 11, 16, 17.) Plaintiffs assert that their allegedly correct interpretation of N.Y. ECL § 13-0309(12) shows that DEC's rationale for regulating in favor of the independent owner-operators is nothing more than a "*post-hoc* rationalization advanced during litigation in order to paint upon the Defendants' actions a patina of legitimacy." (Snead Reply Decl. ¶ 26; <u>see also</u> <u>id.</u> ¶ 16.) Thus, Plaintiffs appear to take the position that, as such, DEC's professed goal of protecting the

---

[41] The fact that the Single Vessel Rule was proposed in December 2015 suggests that the prospect of the Single Vessel Rule taking effect during the 2016 season may have affected the demand for vessel leasing in 2016, when both Edgar and Fernandez sought to lease Shellfish's vessel. Moreover, the fact that Shellfish also leased its vessel, on one other occasion in 2015, to harvest Verbeke's IFQ, is not particularly probative. There is no evidence that, in other years, there was demand for Shellfish's vessel to be leased. Nor is there any evidence that Ocean Fresh's vessel is consistently leased by harvesting companies.

independent owner-operators is not a legitimate local public interest here.[42]  (See Oral Argument

Tr. at 4–5, 13.)

Courts have indicated that, when a state law is subject to heightened scrutiny, the state's

proffered legitimate justifications for a law cannot be a "sham" or a "post hoc rationalization."

Maine v. Taylor, 477 U.S. 131, 149 (1986).  There is limited authority indicating when a state's

professed legitimate interest constitutes a "sham" or "post hoc rationalization."  For example, in

Hughes v. Oklahoma, 441 U.S. 322, 338 n.20 (1979), the Supreme Court rejected a justification

for a discriminatory state law that the state raised, for the first time, in its brief before the Supreme

Court.  The Court remarked that "[t]he late appearance of this argument and the total absence of

any record support for the questionable factual assumptions that underlie it give it the flavor of a

*post hoc* rationalization."  Id.  The Court went on to find that this "bare assertion" by the state was

"certainly inadequate to survive the scrutiny" to which clearly discriminatory laws are subjected.

Id.  As Hughes implies, a state's professed legitimate interest will often be revealed to be a "sham"

if it fails such scrutiny.  Cf. Atlantic Prince, 710 F. Supp. 893, 899 (E.D.N.Y. 1989) ("the State

has failed utterly to meet its burden of proving that the 90–foot limit was motivated by or rationally

served any alleged environmental concerns").

Plaintiffs' arguments are not persuasive.  First, DEC's concern with protecting the

independent owner-operators is not a "*post-hoc* rationalization" advanced only during litigation.

Here, Amendment 1 to the FMP (which was issued in 2009), the December 2015 Notice of

Proposed Rule Making, and the July 2016 Notice of Adoption all discuss, in various ways, DEC's

concern with protecting "independent, single vessel owners."  (FMP Amendment 1 at 26.)  The

---

[42] Plaintiffs stress these points in the reply declaration from their attorney.  Plaintiffs' reply brief, however, cites no authority in the Dormant Commerce Clause context addressing when a legitimate interest proffered by a state constitutes a "post-hoc rationalization" or any other issues related to the Single Vessel Rule.

fact that DEC further elaborated on this rationale during litigation does not show that this is a "*post-hoc* rationalization." Second, Plaintiffs' belief that DEC is not authorized by N.Y. ECL § 13-0309(12) to pursue the goal of protecting independent owner-operators does not show that DEC's justification is a "*post-hoc* rationalization." Plaintiffs' dispute with DEC over the proper interpretation of N.Y. ECL § 13-0309(12) is an issue that Plaintiffs can raise in state court. To the extent that this issue has potential relevance to the question of whether DEC's justification for the Single Rule is a "sham" or "post-hoc rationalization," DEC's interpretation of N.Y. ECL § 13-0309(12) is, at the very least, reasonable. In fact, it appears doubtful that Plaintiffs' interpretation of N.Y. ECL § 13-0909(12) is correct given that Plaintiffs seem to have raised similar arguments in the State Court Action, and the state court, in the denying the motion for a preliminary injunction, concluded that the plaintiffs in that case had failed to show a likelihood of success.[43]

Finally, other facts in the record also undermine Plaintiffs' claim that DEC's professed interest in protecting the independent owner-operators is not legitimate. First, any rules which limit vessels to harvesting only one IFQ also burden in-state interests that are not controlled by Seawatch or Cohen. This is further evidence that DEC's professed interest in protecting independent owner-operators is legitimate. Cf. Atlantic Prince, 710 F. Supp. 893, 899 (E.D.N.Y. 1989) ("[C]ourts are far less likely to find a Commerce Clause violation where a statute visits some of its adverse effects upon in-state interests represented in the legislature.") SMJ, Verbeke, and American Pride—all of which are Plaintiffs here—are also burdened by the Single Vessel Rule. Moreover, when DEC first adopted a single vessel requirement in the 2009 Amendment 1 to the

---

[43] As noted in the Court's earlier discussion of abstention, Plaintiffs' concede, in their reply brief, that the claims that they raised in the State Court Action about the proper interpretation of N.Y. ECL § 13-0309(12) "have no bearing on" their federal claims here. (Pls. Reply. Mem. at 9.) If the question of whether DEC correctly interpreted state law in promulgating the Single Vessel Rule was, in fact, critical to Plaintiffs' preemption claims, then that would seemingly be a reason for the Court to abstain and stay any resolution of Plaintiffs' preemption claims concerning the Single Vessel Rule until that issue of state law was definitively resolved in state court.

FMP, that requirement appears to have burdened additional harvesting companies that, at the time, were not controlled by Seawatch or Cohen. (See supra p. 63 & n.38 (also noting that there were fewer harvesting companies controlled by Seawatch and Cohen that lacked usable vessels in 2009 and 2010).) Second, similar to the Single Vessel Rule, the pre-IFQ regime seemingly required every harvesting company to secure separate usable vessels for the season if they wished to harvest the weekly catch limit (of 28 cages or less) for their eligible vessel or vessels every week.[44] The pre-IFQ regime shows that, even previously, aspects of DEC's regulation of the Surfclam Fishery did not prioritize economic efficiency, which would have favored a conglomerate such as Seawatch. These and other facts in the record are further proof that DEC's professed interest in protecting the independent owner-operators is legitimate.

Ultimately, the fact that all the independent owner-operators are in-state interests and the Seawatch-controlled entities all have out-of-state ties does negate the legitimate interest New York has in protecting the independent owner-operator segment of the fishery as part of a comprehensive environmental conservation scheme. Nor do the statements made in the internal DEC memoranda.

> iii. DEC Has Shown that the Single Vessel Rule is Demonstrably Justified by the Legitimate Local Interest of Protecting Independent Owner-Operators

DEC has shown that the Single Vessel Rule is demonstrably justified by the legitimate local public interest of protecting the independent owner-operators in the context of DEC's broader conservation regulations that govern the Surfclam Fishery. See Maine, 477 U.S. at 138 ("[T]he burden falls on the State to demonstrate both that the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means.").

---

[44] Most vessels in the Surfclam Fishery could harvest that 28-cage limit in a single day. Moreover, prior to 2003, DEC's regulation of the Surfclam Fishery was even more restrictive as there was also a 14-cage daily catch limit. (FMP at 8.)

As DEC argued in opposing Plaintiffs' Dormant Commerce Clause claim, "[t]here is no workable alternative method of protecting single-vessel operators without affecting the commonly owned Permit holders." (DEC Mem. at 18.) The Court agrees with DEC that the purpose of the Single Vessel Rule could not be served as well by other means. The potential alternatives to the Single Vessel Rule—which would involve unrestricted or more limited restrictions on the number of IFQs that a single vessel can harvest—would not only fail to further DEC's legitimate interest in protecting the independent owner-operators, but such alternatives would affirmatively undermine this legitimate state interest of protecting and preserving the independent owner-operator sector of the fishery. Notably, Plaintiffs' reply brief does not address DEC's argument on this point and says nothing about the Single Vessel Rule and heightened scrutiny under a Dormant Commerce Clause analysis.

Accordingly, even assuming that Dormant Commerce Clause cases provide the framework for analyzing Plaintiffs' preemption claim, the Court finds that there is not a likelihood that Plaintiff would prevail under such an approach.[45]

> ii. *The Single Vessel Rule Is Not Preempted Under* Douglas*'s Reasonableness Prong*

Courts appear divided over what standard governs the reasonableness analysis under Douglas. However, under either of the two approaches discussed below, the Single Vessel Rule is not preempted.

In UFO Chuting, the Ninth Circuit concluded that mere rational basis review governs the reasonableness inquiry under Douglas. 508 F.3d at 1194. The Court agrees with UFO Chuting

---

[45] For the same reasons, Plaintiffs cannot show a likelihood of success if the Single Vessel Rule is subjected to Pike balancing. The Single Vessel Rule advances substantial legitimate interests and provides putative benefits to the independent owner-operator sector of the Surfclam Fishery. Those benefits are not outweighed by the burdens placed on Plaintiffs' federally endorsed vessels or on the harvesting companies without vessels which are prevented from harvesting IFQs in a more efficient manner.

and finds, that, under this standard, the Single Vessel Rule easily passes muster.  As the Supreme

Court has explained:

> In areas of social and economic policy, a statutory classification that neither
> proceeds along suspect lines nor infringes fundamental constitutional rights must
> be upheld against equal protection challenge if there is any reasonably conceivable
> state of facts that could provide a rational basis for the classification. . . . .  On
> rational-basis review . . . those attacking the rationality of the legislative
> classification have the burden to negative every conceivable basis which might
> support it[.]  Moreover, because we never require a legislature to articulate its
> reasons for enacting a statute, it is entirely irrelevant for constitutional purposes
> whether the conceived reason for the challenged distinction actually motivated the
> legislature.  Thus, the absence of "legislative facts" explaining the distinction [o]n
> the record, has no significance in rational-basis analysis.  See Nordlinger v. Hahn,
> 505 U.S. 1, 15 (1992) (equal protection "does not demand for purposes of rational-
> basis review that a legislature or governing decisionmaker actually articulate at any
> time the purpose or rationale supporting its classification").  In other words, a
> legislative choice is not subject to courtroom fact-finding and may be based on
> rational speculation unsupported by evidence or empirical data. . . .

F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313–20 (1993) (citations and internal marks

omitted).  For the reasons set forth earlier in the discussion of Douglas's "nondiscriminatory"

prong, the Single Vessel Rule easily survives rational basis review.

Alternatively, even assuming arguendo that the rational basis review standard does not

apply under Douglas and, instead, a higher, more searching standard of reasonableness were to

apply, the Single Vessel Rule still avoids preemption because, even under such a standard,

Plaintiffs have not shown a likelihood of success in establishing that the Single Vessel Rule is

unreasonable.

In conclusion, Plaintiffs have not shown that they are likely to succeed in establishing that

the Single Vessel Rule is preempted.

### 10. The 70-Foot Rule Is Not Preempted

#### i. Parties' Arguments

With respect to the 70-Foot Rule, Plaintiffs contend that the 70-Foot Rule is preempted because it discriminates against out-of-state vessels in favor of New York vessels and fishery interests.  (Pls. Mem. at 20.)  Plaintiffs also assert there is "no legitimate local governmental, health, safety, police or environmental resource reason for the [70-Foot Rule] in the Fishery."  (Id.)  Rather, according to Plaintiffs, "the true nature of the [70-Foot Rule] is for purposes of economic protectionism of favored New York fishery interests."  (Id.)  Plaintiffs expand on these arguments in the context of their Dormant Commerce Clause claim, asserting that there is a discriminatory purpose behind the 70-Foot Rule as evidenced by the legislative history of the 70-Foot Rule as well as the Atlantic Prince decision, which found an earlier restriction on vessels over 90 feet to be discriminatory and struck it down under the Dormant Commerce Clause.  (Id. at 27–29.)  Plaintiffs also assert that the 70-Foot Rule has a discriminatory effect in the Surfclam Fishery on out-of-state vessels that are over 70 feet long.[46]  (Id. at 27; see Snead Decl. ¶¶ 131–37.)

DEC does not explicitly address Plaintiffs' preemption arguments concerning the 70-Foot Rule.  However, in the context of opposing Plaintiffs' Dormant Commerce Clause claims, DEC addresses Plaintiffs' related Dormant Commerce Clause arguments concerning the 70-Foot Rule.  DEC asserts that "the legislative history of the 70-Foot Rule makes it clear that it was passed to protect New York fisheries rather than to discriminate against out-of-state interests."  (DEC Mem. at 20.)  According to DEC, the rationale of the 70-Foot Rule was to protect New York fisheries "from over-exploitation by 'large offshore fishing' vessels not at that time already fishing in New

---

[46]  To the extent that Plaintiffs argue that the 70-Foot Rule is per se preempted simply because it completely excludes certain federally endorsed vessels from the Surfclam Fishery, for the reasons explained earlier, that argument is not tenable.  (See discussion supra pp. 47–51.)

York waters." (DEC Mem. at 20.) DEC argues that the 70-Foot Rule is distinguishable from the bar on vessels over 90 feet that was struck down in <u>Atlantic Prince</u>. Instead, DEC asserts that the 70-Foot Rule is more analogous to the Massachusetts law barring fishing vessels over 90 feet, which was upheld in <u>Davrod</u> by the First Circuit in the face of a Dormant Commerce Clause challenge. <u>See</u> <u>Davrod</u>, 971 F.2d at 783. DEC also stresses that there is no evidence indicating that, when the 70-Foot Rule was enacted, "it affected only or overwhelmingly out-of-state interests." (DEC Mem. at 21.)

Based on the parties' arguments, the question before the Court is whether, under <u>Douglas</u>, the 70-Foot Rule is a reasonable and nondiscriminatory measure that effectuates a legitimate local public interest. The Court will again assume, for the sake of argument, that a Dormant Commerce Clause analysis governs <u>Douglas</u>'s "nondiscriminatory" prong. The Court will first address <u>Douglas</u>'s "nondiscriminatory" prong because, if the 70-Foot Rule discriminates in practical effect or has a discriminatory purpose, then, under a Dormant Commerce Clause analysis, the 70-Foot Rule would be subject to heightened scrutiny. As explained below, Plaintiffs are unlikely to succeed in showing that the 70-Foot Rule has either a discriminatory effect or a discriminatory purpose. As such, under a Dormant Commerce Clause analysis, Plaintiffs could only prevail by showing that, under <u>Pike</u> balancing, the 70-Foot Rule places a burden on interstate commerce that is clearly excessive in relation to its putative local benefits. Plaintiffs have not established that they are likely to succeed in making such a showing. Similarly, Plaintiffs cannot show, under rational basis review, that the 70-Foot Rule is unreasonable under <u>Douglas</u>. Thus, Plaintiffs are ultimately unable to show that they are likely to succeed on their claims that the 70-Foot Rule is preempted.

Before examining whether the 70-Foot Rule is nondiscriminatory and reasonable under Douglas, it is first necessary to briefly survey what the record shows concerning the over-70-foot and under-70-foot clamming vessels at issue here that are excluded by, and exempted under, the 70-Foot Rule.

> ii. *The Length of the Vessels in the Surfclam Fishery and in the Fleet of Seawatch*

The record indicates that the fleets of large vertically integrated clamming conglomerates, such as Seawatch, are likely to consist primarily (and perhaps exclusively) of large vessels over 70 feet.[47] All nine of the usable vessels at issue in this suit that are controlled by Seawatch are over 70 feet long. The four Seawatch-controlled vessels currently operating in the Surfclam Fishery are over 70 feet long, ranging in length from 71.6 feet to 83.2 feet. (Pls. Mem. at 32 n.8.) In addition, the five vessels owned by LET Vessels NJ that various Seawatch-controlled harvesting companies attempted to lease in 2016 "range from between 80.3 and 99.5 feet in length." (Id.) The fact that the Seawatch-controlled harvesting companies did not, in 2016, even attempt to introduce an under-70-foot vessel from out of state into the Surfclam Fishery suggests that Seawatch does not, in fact, own any such usable vessels. Thus, given all the above, it appears that the fleet Seawatch controls is likely made up primarily (or even exclusively) of over-70-foot vessels. It can also be inferred that the fleets of any other conglomerates are likely to be similar in composition.[48] Of course, it is not surprising that such conglomerates, which also harvest in the federal surfclam fishery and in other fisheries, (see Oral Argument Tr. 17, 29), would primarily or

---

[47] For brevity, any such entity will be referred to herein simply as a "conglomerate."

[48] In any event, the composition of the fleets of other conglomerates is less relevant to any of the analyses below because Seawatch is the most important conglomerate in the Surfclam Fishery.

exclusively possess large vessels.[49]

By contrast, it appears that the other four vessels that currently participate in the Surfclam Fishery—which are all owned by either independent owner-operators or independent vessel owning companies—are less than 70 feet long. This suggests—again not surprisingly—that the vessels of most independent owner-operators or independent vessel-owning companies are likely to be under 70 feet in length.[50]

---

[49] In the federal surfclam fishery, under the Individual Transferable Quota ("ITQ") system established in 1990, ITQs are transferable and a conglomerate can accumulate additional ITQs with limited restrictions on such accumulation. (FMP Amendment 1 at 1; see Sharing The Fish 63, 290.) Moreover, there do not appear to be any restrictions on vessel size in the federal surfclam fishery.

[50] Plaintiffs do not specifically address the length of each of the four "independent" vessels that currently participate in the Surfclam Fishery. At one point, the declaration of Plaintiffs' counsel asserts, in conclusory fashion, that with "the exception of one vessel"—which presumably is a reference to the 45-foot *F/V Allegiance* owned by American Pride—"all fishing vessels presently used in the Fishery are greater than 70 feet." (Snead Decl. ¶ 22; see Snead Decl. ¶ 135.)

These general and conclusory allegations, however, are contradicted by a publicly available list maintained by DEC, which identifies all the over-70-foot vessels in New York that are grandfathered in under the 70-Foot Rule. (See List of Exempt Vessels, DEPARTMENT OF ENVIRONMENTAL CONSERVATION, https://www.dec.ny.gov/outdoor/77989.html (last visited on July 11, 2019).) The four vessels controlled by Seawatch that currently operate in the Surfclam Fishery are all on this list. Notably absent from this list, however, are the other four vessels that Plaintiffs admit currently participate in the Surfclam Fishery—the *F/V Susan H* (owned by Shellfish); the *F/V Heaven Sent* (owned by Ocean Fresh), the *F/V Asherah* (owned by Freeport Fish); and *the F/V Allegiance* (owned by American Pride, which Plaintiffs admit is only 45 feet long). Moreover, a federal online database that contains vessel documentation data also confirms that the *F/V Susan H*, the *F/V Heaven Sent*, and the *F/V Asherah* are all less than 70 feet in length. (*Vessel Documentation Search*, NOAA OFFICE OF SCIENCE AND TECHNOLOGY, NATIONAL MARINE FISHERIES SERVICE https://www.st nmfs.noaa.gov/coast-guard-vessel-search/index (last visited on July 11, 2019).) It is appropriate for the Court to take judicial notice of all this information. (To the extent Plaintiffs have any contrary proof, they are, of course, free to submit it to the Court). Again, it is hardly shocking to see that independent companies would have smaller vessels than a conglomerate such as Seawatch.

The Court notes that the federal database of vessel documentation data indicates that the *F/V Heaven Sent* (U.S.C.G. Doc. No. 1153176) is now named the *F/V Miss Iris*. To the extent that this might indicate that Ocean Fresh no longer owns this vessel, that fact would not affect the Court's analysis in any fashion. The federal database indicates that the *F/V Heaven Sent* was only 63 feet long. Thus, to the extent that Ocean Fresh replaced this vessel, the replacement is likely also less than 70 feet as to do otherwise would have required Ocean Fresh to obtain one of the over-70-foot vessels that had been grandfathered in under the 70-Foot rule. In any event, even if Ocean Fresh did obtain a replacement vessel over 70 feet long, the record still suggests that independent companies are more likely than not to have clamming vessels under 70 feet and that the fleets of conglomerates are likely to have primarily/exclusively vessels that are over 70 feet long.

*iii.  The 70-Foot Rule is Not Discriminatory under <u>Douglas</u>*

Plaintiffs have not offered sufficient evidence to show that they are likely to succeed in proving that the 70-Foot Rule has a discriminatory purpose or a discriminatory effect such that heightened scrutiny is appropriate under a Dormant Commerce Clause analysis.

a.  <u>Discriminatory Purpose</u>

To show discriminatory purpose, Plaintiffs rely on the <u>Atlantic Prince</u> decision as well as the legislative history of both the 70-Foot Rule and the 2010 amendment to the 70-Foot Rule.  As explained below, Plaintiffs have not shown that they are likely to succeed in establishing that there is a discriminatory purpose behind the 70-Foot Rule.

In <u>Atlantic Prince v. Jorling</u>, Judge Glasser struck down, under the Dormant Commerce Clause, a New York statute that barred any vessels over 90 feet long from fishing in New York waters.  710 F. Supp. 893 (E.D.N.Y. 1989).  Judge Glasser found that this statute discriminated "in practical effect" against out-of-state fishermen because there was, at most, one 90-foot vessel based in New York, but numerous such vessels were based out-of-state and had sought to obtain New York fishing licenses.  <u>Id.</u> at 896–97.  Additionally, Judge Glasser found the legislative history for the 90-foot restriction included protectionist sentiments and that legislators were aware of its discriminatory effect.  <u>Id.</u>  Based on these findings, Judge Glasser subjected the 90-foot restriction to strict scrutiny, which New York could not meet because, <u>inter alia</u>, the squid fishery at issue in <u>Atlantic Prince</u> did not have a cap on the number of vessels under 90 feet in length (or any cap on the annual squid harvest)—thus, there were obviously alternative means to pursue any purported conservation goals.  <u>Id.</u> at 898–900.

The suspect history of the 90-foot restriction struck down in <u>Atlantic Prince</u>, while relevant, is ultimately insufficient to show that the subsequent 70-Foot Rule—a different statute which was

passed eight years later—also has a discriminatory purpose. Critically, as explained further below, the strong discriminatory effect that Judge Glasser found in <u>Atlantic Prince</u> has not been shown here. Moreover, while the 70-Foot Rule exempted all over-70-foot vessels that were already fishing in New York waters in 1997, it appears generally reasonable to use past participation in a fishery in order to distinguish amongst fishermen when imposing restrictive conservation measures, <u>cf.</u> <u>White Dove</u>, 380 Mass. at 478–79, even though, as occurred in the closure of the Surfclam Fishery in 1993, using past participation as the relevant criteria may often disproportionately benefit in-state residents.

Additionally, the extensive record of discriminatory comments at issue in <u>Atlantic Prince</u> is absent here with respect to the passage of the 70-Foot Rule in 1997. <u>See</u> <u>Davrod</u>, 971 F.2d at 789 (distinguishing <u>Atlantic Prince</u> because the Massachusetts regulation barring vessels over 90 feet lacked the "heavy discriminatory footprints" found in <u>Atlantic Prince</u>). The protectionist statements cited by Plaintiffs here are primarily comments found in a few later pieces of legislative history, which assert that when the original 70-Foot Rule was enacted in 1997 it "was designed to prevent large out-of-state vessel from obtaining permits." These comments, however, were not made in 1997 when the 70-Foot Rule was passed. Rather, they were made in 2010—thirteen years later—when the 70-Foot Rule was amended to allow a one-time replacement for each of the over-70-foot vessels grandfathered in under the 1997 statute. That fact makes these comments in the legislative history less probative on the question of whether the 1997 statute had a discriminatory purpose. Furthermore, contrary to Plaintiffs' arguments, the legislative history of the 1997 statute itself does not indicate an improper protectionist intent to benefit in-state fishery interests. That legislative history: (1) stresses the statute's goal of limiting fishing effort; (2) states that "New York's marine waters are not able to support significant short term or long term increases of

commercial fishing effort, particularly by large capacity offshore fishing vessels"; and (3) states that "[t]his restriction is intended to apply equally to vessels from New York or from outside the State." Although, as Plaintiffs stress, DEC's letter in the legislative history does note that a growth in fishing effort "may also result from the availability in New York of a seasonal or local abundance of marine fish which could be exploited by vessels currently fishing elsewhere"—a point which references a concern unrelated to conservation—this, and the other points cited by Plaintiffs, are insufficient, when DEC's letter is viewed in its entirety, to show that the 70-Foot Rule has a discriminatory purpose.

Ultimately, even when considered together, the Atlantic Prince case, the comments cited by Plaintiffs in the legislative history of the 2010 Amendment to the 70-Foot Rule, and the legislative history of the 1997 version of the 70-Foot Rule are insufficient to show a discriminatory purpose.

b. Discriminatory Effect

Plaintiffs have also not shown that they are likely to succeed in establishing that the 70-Foot Rule discriminates in practical effect, such that heightened scrutiny under the Dormant Commerce Clause framework applies.

Plaintiffs' discriminatory effects argument is overly simplistic: (1) almost all of the vessels that currently participate in the Surfclam Fishery are over 70 feet and are based in New York; (2) all out-of-state vessels over 70 feet long, including the five out-of-state vessels that LET Vessels NJ tried to introduce into the Surfclam Fishery, are barred from entering the Surfclam Fishery by the 70-Foot Rule; and (3) ergo, the 70-Foot Rule has a discriminatory effect that warrants heightened scrutiny. (Snead Decl. ¶ 135.)

There is, however, insufficient evidence of the 70-Foot Rule's alleged discriminatory effects, either in 1997 or the present, to trigger heightened scrutiny under a Dormant Commerce Clause analysis. Moreover, contrary to Plaintiffs' claim, the vast majority of vessels in the current Surfclam Fishery are not over 70 feet. Rather, the four Seawatch-controlled vessels are over 70 feet, but the four vessels owned by independent companies are less than 70 feet.

First, the record does not show that the 70-Foot Rule discriminated, in practical effect, when it was enacted in 1997. The 70-Foot Rule is not confined to the Surfclam Fishery—it covers all commercial fishing vessels in New York. The record, however, does not provide relevant information about the vessels excluded by and exempted from the 1997 statute. Perhaps most importantly, the record does not indicate the residency of all the over-70-foot vessels grandfathered in by the 70-Foot Rule because they were fishing in New York waters in July 1997.

Second, if the Court focuses on the effects of the 70-Foot Rule on the Surfclam Fishery in July 1997—the cutoff for the grandfathered vessels under the 70-Foot Rule—Plaintiffs' discriminatory effect argument makes even less sense. It is difficult to conceive of the 70-Foot Rule as having a discriminatory effect in the Surfclam Fishery in 1997 because non-resident vessels were already explicitly excluded from the Surfclam Fishery by the Residency Rule, which had been in effect since 1993. Thus, the 70-Foot Rule did not cause out-of-state vessels to be excluded from the Surfclam Fishery in July 1997. Rather, there were no out-of-state vessels in the Surfclam Fishery in 1997 as a result of the Residency Rule and/or the fact that the harvesting companies already had their own New York-based vessels at the time. Any purportedly discriminatory effects of the 70-Foot Rule on the Surfclam Fishery—whether in 1997 or now— are due to the fact that: (1) when the 70-Foot Rule was passed in 1997, there could not have been any out-of-state vessels in the Surfclam Fishery because of the Residency Rule; and/or (2) there

may have been limited, if any, demand for such out-of-state vessels in the Surfclam Fishery in 1997.[51]

Third, the 2010 amendment to the 70-Foot Rule diminishes any negative impact of the 70-Foot Rule on out-of-state vessels. The 70-Foot Rule does not preclude a non-resident vessel from being used to replace one of the over 70-foot vessels that were grandfathered in under the 1997 statute. What the 70-Foot Rule establishes is simply a limit on the number of vessels over 70 feet fishing in New York waters. Thus, nothing in the 70-Foot Rule precludes any out-of-state vessel that is over 70-feet from being used, as the one-time replacement, for one of the over-70-foot vessels grandfathered in by the 70-Foot Rule.

Fourth, the actual composition of the fleet in the Surfclam Fishery also undermines Plaintiffs' claim that the 70-Foot Rule has the type of discriminatory effect that would trigger heightened scrutiny under a Dormant Commerce Clause analysis. Contrary to Plaintiffs' suggestion, the Surfclam Fishery is not comprised primarily of over-70-foot vessels. Rather, the fact that the four over-70-foot vessels in the Surfclam Fishery are controlled by a conglomerate such as Seawatch (which also controls numerous other over-70-foot vessels)—but all the under-70-foot vessels in Surfclam Fishery are owned by independent companies—shows that there are other potential justifications for this rule, which are discussed in the next section's analysis of Pike balancing.

Relatedly, the fact that half of the current fleet in the Surfclam Fishery consists of under-70-foot vessels and that new out-of-state vessels under 70 feet long are not excluded by the 70-Foot Rule further shows that the effect of the 70-Foot Rule on out-of-state vessels is insufficient to trigger heightened scrutiny under a Dormant Commerce Clause analysis. There is nothing in

---

[51] Prior to 1997, on one occasion, Verbeke's Surfclam Permit was harvested by a vessel owned by a Massachusetts company. (Snead Reply Decl. ¶ 24; see supra n.3.)

the record suggesting that: (1) in 1997, there were no out-of-state clamming vessels under 70 feet long; or (2) at present, there are no such out-of-state vessels. In fact, the record affirmatively shows the contrary. In 2013, American Pride purchased the *F/V Allegiance*, an old clamming vessel <u>from out-of-state</u>, repaired it, and introduced it into the Surfclam Fishery in 2016. (Corriss Aff. ¶¶ 3, 5.) The 70-Foot Rule does not discriminate, in practical effect, against out-of-state vessels—rather, it distinguishes between the longer vessels of conglomerates such as Seawatch and shorter vessels that are likely to be owned by independent companies.

In light of all the points above, the bare fact that, at present, over-70-foot vessels from out of state are currently excluded from the Surfclam Fishery by the 70-Foot Rule while certain over-70-foot vessels from New York can harvest in the Surfclam Fishery is insufficient to show that the 70-Foot Rule discriminates in "practical effect" such that heightened scrutiny is triggered under a Dormant Commerce Clause analysis.

<i>iv.  <u>Pike</u> Balancing and <u>Douglas</u>'s Reasonableness Prong</i>

As explained above, Plaintiffs cannot show that the 70-Foot Rule has, under a Dormant Commerce Clause framework, a discriminatory purpose or discriminates, in practical effect, against out-of-state vessels. Thus, to prevail, Plaintiffs would have to show that the 70-Foot Rule fails <u>Pike</u> balancing or that the 70-Foot Rule is unreasonable under <u>Douglas</u>. As the <u>Pike</u> standard is potentially easier for a plaintiff to meet than rational basis review, the Court focuses on <u>Pike</u> balancing. For the reasons set forth below, Plaintiffs have not established a likelihood of success under <u>Pike</u>. As such, the 70-Foot Rule also survives under rational basis review—which, as the Court concluded earlier, controls <u>Douglas</u>'s reasonableness prong.

When undertaking <u>Pike</u>-balancing, courts consider whether "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." <u>United</u>

Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., 550 U.S. 330, 346 (2007)

(quoting Pike, 397 U.S. at 142); see also UFO Chuting, 508 F.3d at 1196 ("A facially neutral

statute may violate the Commerce Clause if 'the burdens of the statute . . . so outweigh the putative

benefits as to make the statute unreasonable or irrational.'  A statute is unreasonable or irrational

when 'the asserted benefits of the statute are in fact illusory or relate to goals that evidence an

impermissible favoritism of in-state industry over out-of-state industry.'" (quoting Alaska

Airlines, Inc. v. City of Long Beach, 951 F.2d 977, 983 (9th Cir. 1991))).  "[T]he extent of the

burden that will be tolerated will of course depend on the nature of the local interest involved, and

on whether it could be promoted as well with a lesser impact on interstate activities."  Pike, 397

U.S. at 142.

In undertaking this analysis, courts can consider any putative benefits even if such benefits

or the purposes of the statute are not explicitly spelled out in the statute itself.  See Perfect Puppy,

Inc. v. City of E. Providence, 98 F. Supp. 3d 408, 417 (D.R.I. 2015), aff'd in part, appeal dismissed

in part, 807 F.3d 415 (1st Cir. 2015) ("Plaintiff maintains that the ordinance 'has no stated

purpose.'  However, a 'putative' benefit, by definition, need not be spelled out explicitly in the

text of the challenged legislation to be legitimate."); cf. Kassel v. Consol. Freightways Corp. of

Delaware, 450 U.S. 662, 680–682, 682 n.3, 692 n.4, 702–03, 703 n.13 (1981) (decision where

seven justices, split between the majority and the dissent, focused on whether Iowa trucking laws

had sufficient safety benefits to justify their burden on interstate commerce despite view of two

concurring justices that the "burdens imposed on commerce" should only be "balanced against the

local benefits actually sought to be achieved by the State's lawmakers, and not against those

suggested after the fact by counsel"); Virginia Uranium, Inc. v. Warren, 139 S.Ct. 1894, 1905

(2019) (explaining, in opinion joined by two other justices, that in field preemption cases, the

Supreme Court has generally focused on "*what* the State did, not *why* it did it") (Gorsuch, J.,). Moreover, some courts have indicated that "whether a law's putative benefits 'actually come into being' has no impact on the Pike analysis. Only the putative benefits of the ordinance need be considered, not its wisdom or effectiveness in implementing these benefits." Perfect Puppy, 98 F. Supp. 3d at 417 (quoting Pharm. Care Mgmt. Ass'n v. Rowe, 429 F.3d 294, 313 (1st Cir. 2005)).

It is not clear whether, in conducting the analysis under Pike, the Court should focus on the benefits and burdens of the 70-Foot Rule at the time it was enacted in 1997, at present, or at both times. As explained below, whatever the relevant time frame for consideration, the 70-Foot Rule survives Pike balancing.[52]

While neither side raises any specific arguments about the application of Pike balancing to the 70-Foot Rule, the parties raise related arguments about the purpose and function of the 70-Foot Rule in the Surfclam Fishery and in New York's fisheries in general.

Plaintiffs contend that the 70-Foot Rule does not serve any conservation purpose (or any other legitimate purpose) in the Surfclam Fishery. DEC responds that the 70-Foot Rule has a conservation purpose—namely, to protect New York fisheries from over-exploitation by "large off-shore fishing" vessels that were not, as of July 1997, already fishing in New York waters. Vessel size restrictions are one tool for limiting fishing effort and catches. See Davrod, 971 F.2d at 790; see also Sharing the Fish 116–17. And, there is nothing in the record indicating that the

---

[52] The Court notes that, UFO Chuting notwithstanding, it is not clear that Pike balancing is appropriate as part of the "nondiscriminatory" prong under Douglas. Even in the Dormant Commerce Clause context, Pike balancing is routinely criticized by courts and commentators, including the Supreme Court itself, raising questions whether it is appropriate to import the Pike test into the preemption context. See, e.g., United Haulers, 550 U.S. at 347 (criticizing Pike balancing in Dormant Commerce Clause case). Moreover, even assuming that the general Pike framework applies, there is also a question as to what burdens should be considered in the balancing here because this is a preemption case involving federal fishery endorsements, not a Dormant Commerce Clause case where it is clear that Pike balancing would consider the burdens imposed on interstate commerce generally. In any event, the Court has assumed that the latter approach, which focuses on the burdens on interstate commerce generally, applies here. Even under that approach, Plaintiffs cannot show a likelihood of success.

70-Foot Rule does not have putative conservation benefits in the other fisheries in New York waters (or that it did not provide such benefits in 1997 when the 70-Foot Rule was enacted). However, as Plaintiffs point out, it is less clear what conservation function the 70-Foot Rule serves in the Surfclam Fishery given the various restrictions—including daily catch limit and gear restrictions—already in place on the harvesting companies. DEC does not specifically address what conservation function the 70-Foot Rule serves in the current Surfclam Fishery (or served in the Surfclam Fishery as it existed in 1997).

Because the 70-Foot Rule serves a conservation function in other fisheries, Plaintiffs' argument suggests that the problem, if any, with the 70-Foot Rule is one of overbreadth.[53] Given the general conservation benefits of the 70-Foot Rule, those benefits alone might be sufficient to survive Pike balancing despite any potential overbreadth.[54] In any event, the 70-Foot Rule also survives Pike balancing because the statute provides other putative benefits by protecting independent owner-operators, which are, in the specific context here, putative benefits that can be counted in New York's favor as part of Pike balancing.

---

[53] The fact that the 70-Foot Rule serves, at the very least, conservation purposes in other fisheries is likely sufficient, on its own, to survive rational basis review. See Martinez v. Mullen, 11 F. Supp. 3d 149, 160 (D. Conn. 2014), aff'd sub nom. Sensational Smiles, LLC v. Mullen, 793 F.3d 281 (2d Cir. 2015) ("It is not enough for the challenger to show that the government was actually mistaken in its factual assumptions or reasoning . . . or that the restriction adopted is under-inclusive or underinclusive. A statute suffering from all of these flaws may still survive rational basis scrutiny." (emphasis added)).

[54] The fact that the 70-Foot Rule, generally, has conservation benefits may alone be sufficient for the 70-Foot Rule to survive Pike balancing, even as applied to Plaintiffs and the Surfclam Fishery. Cf. Pike, 397 U.S. at 146 (striking down state law as applied to plaintiff, but noting that the "incidental" negative consequences of the state regulatory scheme on this particular plaintiff "could perhaps be tolerated if a more compelling state interest were involved"). Conservation is an important state interest and it would not seem unreasonable for the New York Legislature to enact a broad, easily enforced statute that applies to all of its fisheries rather than parsing the nuances of each fishery and the particular regulatory regimes in effect at the time for each fishery—regimes that might be flux in various ways. (For example, when the 70-Foot Rule was enacted in 1997, the Surfclam Fishery was operating under emergency regulations and without a fishery management plan).

a.  The 70-Foot Rule Provides Putative Benefits to Independent
    Owner-Operators

The putative benefits from the 70-Foot Rule are illustrated by the record in this case, which shows that the 70-Foot Rule precluded LET Vessels NJ—which is controlled by Seawatch—from introducing five additional over-70-foot vessels from Seawatch's fleet of large vessels into the Surfclam Fishery to harvest Surfclam Permits for the Seawatch-controlled harvesting companies.

Contrary to Plaintiffs' suggestion, the 70-Foot Rule serves a legitimate function in the Surfclam Fishery.  Like the Single Vessel Rule, the 70-Foot Rule provides putative benefits by helping to protect the independent owner-operator sector of the Surfclam Fishery from large conglomerates, which have fleets of numerous large vessels and as well as processing facilities and seek to control multiple Surfclam Permits and IFQs.  The 70-Foot Rule protects independent owner-operators by helping to maintain an economically level playing field between independent owner-operators and vertically integrated conglomerates.  Relatedly, the 70-Foot Rule disincentivizes conglomerates from owning and acquiring additional Surfclam Permits that were originally held by independent owner-operators.

The 70-Foot Rule works in conjunction with the Single Vessel Rule to provide such benefits and disincentives.  Under the 70-Foot Rule and the Single Vessel Rule (as well as under the original single vessel requirement set out in FMP Amendment 1), if a conglomerate acquires (or previously acquired) an owner-operator harvesting company (along with its Surfclam Permit and its eligible vessel slot) the conglomerate must either maintain that harvesting company's current vessel (which is likely under 70 feet long) or obtain another vessel that is under 70 feet long.  Absent the 70-Foot Rule, the conglomerate could simply use one of the other over-70-foot vessels that is already in its fleet and that is likely also harvesting large amounts of surfclams in other fisheries.  (See Oral Argument Tr. 17, 29).  This would have fewer costs than maintaining

the acquired harvesting company's old under-70-foot vessel to harvest one Surfclam Permit/IFQ. Independent owner-operators with a single vessel, however, are unlikely to be able to take advantage of such economies of scale. Also, by imposing these costs on conglomerates, the 70-Foot Rule disincentivizes them from owning and acquiring additional Surfclam Permits that were originally held by independent owner-operators.

Notably, the 70-Foot Rule still allows a conglomerate such as Seawatch to use all the over-70-foot vessels that it was already using as of 1997 and even allows one-time replacements for those vessels.

Even under the pre-IFQ regime that was in effect in 1997, each harvesting company appears to have needed separate usable vessels to ensure that they could harvest the weekly catch limit for each eligible vessel. Thus, under the regime in place in 1997, a conglomerate likely would have wanted to fill any eligible vessel slot it acquired with one of the over-70-foot vessels from its existing fleet (rather than owning and maintaining the under-70-foot vessel that likely occupied that slot). The 70-Foot-Rule, however, would prevent a conglomerate from doing so and, thus, would help maintain an economically level playing field and would also provide disincentives for a conglomerate to acquire and control the Surfclam Permits of independently owned harvesting companies with eligible vessels under 70 feet long. (Despite the fact that the 70-Foot Rule has been in place since 1997, Seawatch nevertheless acquired control over additional harvesting companies knowing that it would have to either maintain any under-70-foot vessels it acquired or eventually replace them with other vessels that are under 70 feet long.)

To protect independent owner-operators and prevent accumulation of Surfclam Permits by conglomerates, New York could have imposed greater restrictions on Surfclam Permits that prevented a conglomerate such as Seawatch from acquiring control of additional Surfclam Permits

and eligible vessels in the first place.[55]  (See supra n. 31.)  Instead, New York chose other rules—such as allowing Surfclam Permits to be held by corporations and allowing certain vessel leasing—that provided other benefits, including, for example, allowing the possibility that an independent owner-operator could sell his harvesting company (along with its Surfclam Permit and eligible vessel) to Seawatch or even, potentially, to a new fisherman who also wanted to be an independent owner-operator.  However, even under such a system, a New York statute that helps maintain an economically level playing field and provides disincentives for a conglomerate to acquire and own such Surfclam Permits advances legitimate local interests and provides putative benefits to independent owner-operators.

Two additional points merit brief discussion.

First, in addition to benefitting the independent owner-operators, the 70-Foot Rule can also be viewed as benefitting American Pride and Freeport Fish, the two independent vessel-owning companies without Surfclam Permits whose vessels are under 70 feet long.  The 70-Foot Rule has created demand for these independent vessels in the Surfclam Fishery.  Absent the 70-Foot Rule, any harvesting company without a usable vessel (including, at present, Edgar, Fernandez, SMJ, and Verbeke) might simply lease longer vessels from Seawatch-owned companies or other conglomerates, possibly shutting new independent vessel owners out of the Surfclam Fishery.  Just as New York has a legitimate interest in protecting the original independent owner-operators in

---

[55]  Such restrictions would have imposed a greater burden on interstate commerce than the regime New York ultimately adopted, which allows a conglomerate such as Seawatch to still acquire control of multiple harvesting companies and allows leasing of certain vessels under 70 feet, but also includes certain other measures, such as the 70-Foot Rule and the Single Vessel Rule, which disincentivize such control and blunt the negative impacts of such control on the remaining independent owner-operators.  Cf. Pike, 397 U.S. at 142 ("[T]he extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.").  Relatedly, the fact that other fisheries, such as the federal Pacific Halibut and Sablefish Fishery, attempt to protect independent owner-operators by imposing similar or even greater restrictions—such as not allowing certain categories of quota share/IFQs to be used on longer vessels and limiting the ability to transfer certain categories of quota shares—seems to be further proof that the 70-Foot Rule has putative benefits in the Surfclam Fishery.

the Surfclam Fishery, it could also have a legitimate interest in favoring other "independent" fishermen and vessel owners, who are likely to have smaller vessels, when it sets up rules that determine which new vessels can be introduced into the Surfclam Fishery.

Second, even if the Court did not consider any of the evidence which shows that the independent owner-operators are more likely to own vessels that are less than 70 feet in length, (see supra n.50), the analysis above is still valid. Even assuming arguendo that the independent owner-operator sector had a generally mixed fleet of over-70-foot and under-70-foot vessels, the 70-Foot Rule still provides putative benefits. Specifically, the independent owner-operator sector would still benefit from the 70-Foot Rule because Plaintiffs' own evidence indicates that the fleet of a conglomerate such as Seawatch is likely composed primarily/exclusively of vessels that are over 70 feet long. Thus, the 70-Foot Rule would still help maintain an economically level playing field and disincentivize a conglomerate from purchasing and owning any of the harvesting companies with vessels under 70 feet long.

b. The 70-Foot Rule Might Have Other Putative Benefits

The daily catch limit of 28 cages and gear restrictions imposed by DEC appear to eliminate most of the competitive advantage that might otherwise accrue to larger and longer vessels in the Surfclam Fishery. However, if longer vessels still provide any competitive advantage, the 70-Foot Rule could provide additional putative benefits by preventing any harvesting company (including those owned by a conglomerate such as Seawatch) from upgrading to much longer vessels that might, in some fashion, alter the competitive balance in the Surfclam Fishery. For example, one potential impact of longer vessels is that they may be better able to harvest in worse weather than smaller vessels. See Davrod, 971 F.2d at 782.

The 70-Foot Rule's preclusion of longer vessels could conceivably also provide putative benefits by facilitating enforcement, particularly under the regulations that governed the Surfclam Fishery in 1997. Although, in 1997, daily and weekly catch limits were in place, (FMP at 8), cheating could possibly still occur, and longer vessels presumably have a greater carrying capacity than shorter vessels. (See FMP Amendment 1 at 25 (indicating that different vessels in the Surfclam Fishery may have different carrying capacities); FMP at 8 (indicating that "most" vessels in the Surfclam Fishery can hold more than 28 cages).) Thus, conceivably, longer vessels could possibly cheat more than shorter vessels. The 70-Foot Rule, however, precludes new over-70-foot vessels and, thus, could be seen as a simple, additional enforcement mechanism that might help limit potential cheating. Notably, Amendment 1 to the FMP indicates that, under the pre-IFQ regime, there were allegations of illegal harvesting by harvesting companies. (FMP Amendment 1 at 13.) Moreover, the pre-IFQ regime in place in 1997 had more limited enforcement mechanisms. (See FMP Amendment 1 at 17, 19 ¶ 2.2.10, 29–31, 36, 40.) Thus, the 70-Foot Rule's potential benefits related to enforcement might be another putative benefit that also weighs in New York's favor.[56]

---

[56] Admittedly, the impact of this potentially putative benefit is reduced by the fact that the 70-Foot Rule did not impose a blanket ban on vessels over 70 feet in length and instead grandfathered in all such existing vessels. The Court also recognizes that, in July 2010—after DEC adopted additional enforcement measures in FMP Amendment 1—DEC stated in a letter to the Legislature concerning the possibility of amending the 70-Foot Rule to allow a ten-percent length increase for replacement vessels, that "from a law enforcement perspective, the length of the fishing vessel has little impact on DEC's ability to monitor the commercial fishing industry." (July 30, 2010 Ltr. from DEC, Compl., Ex. J.)

c. <u>The Burdens of the 70-Foot Rule Do Not Clearly Outweigh its Benefits</u>

The putative benefits that the 70-Foot Rule provides in the Surfclam Fishery are not illusory. The 70-Foot Rule protects independent owner-operators by helping to maintain an economically level playing field between independent single vessel owners and conglomerates. Relatedly, the 70-Foot Rule also disincentivizes conglomerates from acquiring and owning the Surfclam Permits of independently owned and operated harvesting companies. In the context of the closed Surfclam Fishery, these are substantial state interests. Moreover, as noted previously, New York could have imposed greater restrictions on Surfclam Permits that precluded a conglomerate such as Seawatch from acquiring control over any additional Surfclam Permits and eligible vessels in the first place. Instead, New York took lesser measures that are reasonable and still help effectuate the substantial state interests discussed above. The 70-Foot Rule also has other potential putative benefits identified above.[57] The relevant burdens are that certain endorsed vessels are excluded from the Surfclam Fishery and the Plaintiff harvesting companies without vessels will be unable to harvest their Surfclam Permits (and related IFQs) in the most efficient manner possible. Plaintiffs are not likely to succeed in showing that these burdens clearly outweigh the countervailing putative benefits created by the 70-Foot Rule in the Surfclam Fishery. Accordingly, Plaintiffs are not likely to succeed in establishing that the 70-Foot Rule is preempted.

While the Court finds that the 70-Foot Rule is likely to survive <u>Pike</u> balancing, the Court nevertheless notes the following about the role of 70-Foot Rule in the Surfclam Fishery. Fishery management schemes, like the instant IFQ system, can be complex and include numerous interlocking rules. One would expect each of the rules in such a system to be logically designed

---

[57] Even excluding all the other potential putative benefits discussed earlier concerning general conservation benefits, competitive balance, and enforcement, (<u>see</u> <u>supra</u> pp. 85 n.54, 89–90), the Court still finds that Plaintiffs are unlikely to succeed under <u>Pike</u> balancing.

with clear purposes in mind.  For example, Amendment 1 to the FMP sets out a rather exhaustive list of the various measures that DEC considered and weighs the advantages and disadvantages of each of these potential measures.  The absence in the record of such an analysis of the 70-Foot Rule's impacts on the Surfclam Fishery is surprising.  Nevertheless, that is not a reason to find the 70-Foot Rule preempted here because, as explained above, the 70-Foot Rule survives <u>Pike</u> balancing.  That said, to the extent that New York seeks to achieve specific goals in the Surfclam Fishery, New York might be well advised to craft laws that do so in a manner that is specifically keyed to the particular regulatory scheme that governs the Surfclam Fishery.

## F.  <u>Plaintiffs' Equal Protection Challenge to the 70-Foot Rule</u>

Plaintiffs also allege that the 70-Foot Rule violates the Equal Protection Clause.

Under the Equal Protection Clause, "the state must treat similarly situated individuals similarly, in the absence of an adequate reason to distinguish between them."  <u>Ramos v. Town of Vernon</u>, 353 F.3d 171, 174 (2d Cir. 2003).  The threshold question for any equal protection claim is to "ascertain[] the appropriate level of scrutiny."  <u>Id.</u>

Plaintiffs contend that residency is a suspect classification and that the 70-Foot Rule violates the Equal Protection Clause because it was intended to discriminate against out-of-state vessels and fishermen.  Plaintiffs, however, have not shown that they are likely to succeed on their Equal Protection challenge to the 70-Foot Rule.

 First, Plaintiffs have not shown that they are likely to succeed on their argument that residency is a suspect classification.  In support of this argument, Plaintiffs rely on <u>Troyer v. Town of Babylon</u>, 483 F. Supp. 1135, 1140 (E.D.N.Y.), <u>aff'd sub nom.</u>, <u>Troyer v. Town of Southampton</u>, 628 F.2d 1346 (2d Cir. 1980), <u>aff'd sub nom.</u>, <u>Town of Southampton v. Troyer</u>, 449 U.S. 988 (1980).  In <u>Troyer</u>, the district court struck down, on both First Amendment and Equal Protection

grounds, a Southampton ordinance that "prohibit[ed] door-to-door distribution of religious literature and the solicitation of funds without the prior consent of the occupants, but exempts from its operation any person who has resided or maintained a place of business in the town for at least six months." Troyer, 483 F. Supp. at 1136. In deciding the equal protection issue, the district court stated that ordinances based on residency, like those based on citizenship and alienage, create "a suspect classification and must be shown to be necessary to further a compelling state interest." Id. at 1140 (citing cases involving alienage discrimination and not discrimination based on the plaintiff's state of residency). The Second Circuit and Supreme Court's summary affirmances do not indicate whether they agreed with both of the grounds for the district court's decision.

As an initial matter, Troyer is factually distinguishable from the instant case both because of the subject matter of the ordinance at issue and, more importantly, because Troyer did not involve a simple classification based on residency, but one based on duration of residency. In fact, the district court in Troyer expressly relied on authority striking down laws involving durational residency requirements. Id. at 1140 ("Laws that prohibit newly arrived persons in a state or county from receiving the same benefits as established residents unconstitutionally burden the right to travel.") (citing Shapiro v. Thompson, 394 U.S. 618 (1969); Memorial Hospital v. Maricopa County, 415 U.S. 250 (1974)).

Moreover, other cases cast doubt on Troyer's sweeping pronouncement that—like citizenship and alienage—any state law based on residency "creates a suspect classification and must be shown to be necessary to further a compelling state interest." Id. at 1140. For example, in the context of public education, subsequent decisions from the Supreme Court and the Second Circuit have recognized that "[a] bona fide residence requirement" that is "uniformly applied" "implicates no 'suspect' classification" and is, therefore subject to only rational basis review

provided that "the 'service' that the State would deny to nonresidents is not a fundamental right protected by the Constitution." Martinez v. Bynum, 461 U.S. 321, 328 n.7 (1983); see Catlin v. Sobol, 93 F.3d 1112, 1120 (2d Cir. 1996) ("[I]n Martinez the Court explained that a bona fide residency requirement implicates no 'suspect' classification, and as long as no fundamental right is implicated, is subject only to rational review."). Additionally, cases rejecting equal protection challenges to state fishing laws have also concluded that residency is not a suspect classification. See Marilley v. Bonham, 844 F.3d 841, 854 (9th Cir. 2016) (en banc) (rejecting equal protection challenge to the higher fees that California charges non-residents for fishing licenses and analyzing fees under rational basis review because "California's commercial fishing fee differentials do not 'classify persons based on protected characteristics, such as race, alienage, national origin, or sex' or 'affect the exercise of fundamental rights'") (quoting Fields v. Legacy Health Sys., 413 F.3d 943, 955 (9th Cir. 2005)); Dairy v. Bonham, No. 13-CV-1518, 2013 WL 3829268, at *6 (N.D. Cal. July 23, 2013) (applying rational basis review and rejecting equal protection challenges to California crabbing law —which assigned the number of crab traps to all permit holders, including non-residents, based on their prior landings of crabs in California—because "nonresidents are not a suspect class" and fishing regulations do not trigger strict scrutiny since the right to pursue a "livelihood" is not a fundamental right under the Equal Protection Clause).

Based on the authority above, Plaintiffs have not shown that they are likely to prevail on their legal argument that residency is a suspect classification. And, as explained earlier, the 70-Foot Rule survives rational basis review.

Second, Plaintiffs have also not shown that they are likely to succeed in proving their factual argument that the "intent underlying the adoption of" the facially neutral 70-Foot Rule "is entirely centered on keeping out-of-state vessels and fishermen out of New York waters" and that

the 70-Foot Rule is a "'residency based classification.'"[58] (Pls. Mem. at 40–41.) In denying Plaintiffs' preemption claim, the Court rejected Plaintiffs' arguments concerning the alleged discriminatory purpose and discriminatory effect of the 70-Foot Rule. For essentially the same reasons, the Court finds that the related arguments Plaintiffs advance in support of their equal protection claim are unlikely to succeed.

Thus, for the reasons stated above, Plaintiffs have not shown that they are likely to prevail in establishing that the 70-Foot Rule violates the Equal Protection Clause.

## G. Plaintiffs' Remaining Challenges to the Residency Rule

In light of the Court's rulings that Plaintiffs are unlikely to prevail on their challenges to the 70-Foot Rule, it is unnecessary for the Court to reach the question of whether Plaintiffs are likely to succeed on their claims that the Residency Rule is preempted or is unconstitutional under either the Equal Protection Clause or the Privileges and Immunities Clause.[59] DEC denied the harvesting companies' attempts to use the five vessels owned by LET Vessels NJ on two separate and independent grounds: (1) the Residency Rule bars these vessels because they are from out of state; and (2) the 70-Foot Rule bars these vessels because they are all over 70 feet long. Because the latter ground is valid and is an independent basis for DEC to preclude those vessels from the Surfclam Fishery, none of the Plaintiffs can show that the Residency Rule actually caused them any independent harm such that a preliminary injunction might be appropriate here. Even

---

[58] Unlike the facially neutral 70-Foot Rule, the ordinance in Troyer was explicitly based on residency.

[59] It appears doubtful that Plaintiffs' Privileges and Immunities challenge is viable because, as a threshold matter, corporations and LLCs cannot bring Privileges and Immunities challenges. See Tennessee Wine & Spirits Retailers Ass'n v. Thomas, --- S. Ct. ----, No. 18-96, 2019 WL 2605555, at *6 (U.S. June 26, 2019) ("[T]he Privileges and Immunities Clause has been interpreted not to protect corporations[.]"); Swedenburg v. Kelly, No. 00-CV-0778, 2000 WL 1264285, at *11 n.30 (S.D.N.Y. Sept. 5, 2000) (stating that the "Supreme Court has long held that the Privileges and Immunities Clause of Article IV does not protect corporations" and noting other authority indicating that unincorporated associations and limited partnerships are also not citizens within the meaning of the Privileges and Immunities Clause); Dairy v. Bonham, No. 13-CV-1518, 2013 WL 3829268, at *6 (N.D. Cal. July 23, 2013) (holding that LLC lacked "standing to bring a privileges-and-immunities claim").

assuming _arguendo_ that Plaintiffs were to show that the Residency Rule is likely to be preempted, the five vessels at issue owned by LET Vessels NJ would still be barred under the 70-Foot Rule. As such, the Court does not reach the question of whether Plaintiffs are likely to succeed on their merits of the challenges to the Residency Rule. That said, the Court notes that the validity of the Residency Rule appears, as a matter of preemption, to be questionable after Douglas. _See_ Douglas, 431 U.S. at 285 n.22 (indicating, in dicta, that a different New York fisheries law with a reciprocity requirement was discriminatory); _cf._ Sporhase v. Nebraska, ex rel. Douglas, 458 U.S. 941, 958 n.18 (striking down reciprocity requirement in state law governing water export under the Dormant Commerce Clause and explaining that, under Great Atlantic & Pacific Tea Co. v. Cottrell, 424 U.S. 366, 379–381 (1976), "[t]he reciprocity requirement cannot, of course, be justified as a response to another State's unreasonable burden on commerce.").

### III. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction is denied. Defendants must answer the complaint within 21 days.

Dated: July 11, 2019
Central Islip, New York

_____/s/ (JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE